51 S.W.3d 314 (2001)
In the Interest of R.D.Y., A Child.
No. 01-99-01073-CV.
Court of Appeals of Texas, Houston (1st Dist.).
April 12, 2001.
Rehearing Overruled June 1, 2001.
*316 Robin D. Etie, Pasadena, for appellant.
David M. Eiser, Houston, Dennis Martin Morrow, Weatherford, for appellee.
Panel consists of Chief Justice SCHNEIDER and Justices TAFT and BRISTER.

*317 OPINION
SCHNEIDER, Chief Justice.
Appellant filed a motion for rehearing. We deny the motion, but withdraw our original opinion of February 1, 2001 and issue this one in its stead. Appellant, R.D.E. ("Mother"), and R.A.Y. ("Father") together had a son, R.D. ("Child"). Mother was given sole custody of Child. Appellees, Father and D.E, the maternal grandmother, ("Grandmother") filed a motion to modify the custody order. At the hearing on the motion, the trial court gave three-way joint custody to Mother, Father, and Grandmother. Mother was given limited visitation. Mother appeals the modification of the custody. We reverse in part and affirm in part.

Factual and Procedural Background
On July 9, 1996, the trial court adopted an order establishing that Father was the father of the child naming Mother the sole managing conservator. On February 7, 1997, Father filed a motion to modify in a Suit Affecting the Parent Child Relationship (SAPCR). He requested that he be named managing conservator of Child. Three days later, Grandmother filed a motion in the SAPCR requesting that she be named managing conservator of the child. A trial was held on these motions. The child was 12 years old at the time of the trial.
On June 11, 1999, the trial court appointed Mother, Grandmother, and Father as Joint Managing Conservators of Child. Grandmother was given the right to establish the primary residence of the child. Mother was awarded visitation at specified dates and times and was allowed possession of the child if Grandmother agreed in advance in writing. The trial court also gave Grandmother the sole discretion to determine if Mother was mentally capable of exercising her visitation with the child.
In six points of error, Mother appeals the order removing sole custody of the child from the mother and giving Mother, Grandmother, and Father joint custody. In her first issue, Mother contends the trial court erred by failing to file specific findings of fact and conclusions of law. In her second issue, Mother argues the trial court erred when it delegated the power of setting visitation between Mother and Child to Grandmother. Third, Mother suggests the trial court's order violates the constitutional right of a mother to raise her son. In her fourth issue, Mother contends Grandmother lacked standing to sue for custody. Fifth, Mother argues the evidence was insufficient to support the order changing Mother's sole managing conservatorship to a joint managing conservatorship for Grandmother and Father. Finally, Mother argues the trial court erred in awarding attorney's fees against her to the attorney ad litem for the child.

Analysis
1. Factual Sufficiency Review
We begin with Mother's issue five. Mother argues the evidence was insufficient to support the order changing her sole managing conservatorship to a joint managing conservatorship between Mother, Grandmother, and Father.

A. Standard of Review
A trial court has broad discretion in deciding the issue of conservatorship modification and will not be reversed absent a clear abuse of discretion. See Seidel v. Seidel, 10 S.W.3d 365, 368 (Tex. App.Dallas 1999, no pet.); Warchol v. Warchol, 853 S.W.2d 165, 167 (Tex.App.Beaumont 1993, no writ). In child custody cases, factual insufficiency is not an independent ground for asserting error; however, it is relevant in determining if the *318 trial court abused its discretion. See Seidel, 10 S.W.3d at 368; In re A.D.H, 979 S.W.2d 445, 447 (Tex.App.Beaumont 1998, no pet.). The factual sufficiency standard used in reviewing the sufficiency of a jury verdict is also used in reviewing a trial court's finding of facts. See Seidel, 10 S.W.3d at 368. After examining all the evidence, we will only set aside the trial court's findings if they are so against the great weight of the evidence that they are clearly wrong and unjust. See id.

B. The Evidence
The evidence shows that Mother got pregnant and chose to have the baby without marrying Father. She moved into a house opposite Grandmother's home. She paid her own bills by working part-time as a self-employed attorney. Mother raised the Child alone, with the exception of a few baby clothes, diapers, and food provided by Grandmother.
When Child was about four years old, Mother's relationship with Grandmother deteriorated and they stopped speaking. Grandmother watched Child a few times while Mother was at work, and Mother and Grandmother communicated through hand-written notes. On one such instance, Grandmother allowed Child to go for a bike ride on the handlebars of a neighbor's bike. However, Child fell and suffered a concussion, and Mother blamed Grandmother for not watching Child more closely.
An employee from Child Protective Services (CPS) testified that the agency received a report that Mother had been hitting Child. Child had a cut over his eye, and the Child's school was not able to locate Mother. CPS was finally able to make contact with Mother, but Mother denied the abuse and neglect allegations. Although CPS recommended parenting classes and psychological evaluation, Mother was unwilling to receive these services and felt there was nothing wrong.
About three months later, CPS received a report that Mother was intoxicated and asking people on the street if she could live with them because she had no place to live and no food to eat. When CPS contacted Mother, she explained that she was hot and needed a fan, but that there was nothing else wrong. Then CPS found that Child had been left at a church day-care center. An investigator spoke to Child, who stated that he was hungry and could not remember the last time he ate. CPS also found him to be "dirty" and "filthy."
CPS considered filing for custody of Child, but realized Grandmother had already done so. A caseworker went to Mother's home with a law enforcement officer to interview Child. The door was open, and they entered the home. CPS found the condition of the home to be a "deplorable living environment." Testimony indicated there was trash all over the house, spoiled milk on the table, maggots on the chicken that had been left sitting out, broken mattresses and bicycles everywhere, and a broken, corroded toilet in the bathroom. The record contains pictures of the home in this condition. However, Mother also admitted into evidence pictures of her home taken later that depicted the living area as neat, clean, and tidy.
CPS workers found Child at school and talked with him. Child told the caseworker that he was worried about what was going on at home, and asked he if would have to go back home to Mother. There were five reports of abuse and/or neglect made to CPS between September 1990 and July 1996.
At some point, Mother was arrested. The day care center called Grandmother and asked her to pick up Child because Mother had not done so. Grandmother *319 picked up Child and took him with her when she went to get Mother from jail. Mother was upset that Child had been brought along to watch her being released from jail. Grandmother testified that, in retaliation, once the car was on the freeway, Mother hit Grandmother in the head and took Grandmother's glasses off while Grandmother was driving. Child became scared, and Grandmother remembered Child saying, "Momma, please, don't hit her. Hit me."
When they got home, Mother took off all her clothes and took a Clorox bath. Then, remaining naked, Mother made Child take three Clorox baths to cleanse any germs from Grandmother's car. Later that night, after Child was asleep, Grandmother testified that Mother attacked her with a frying pan and some hedge clippers. Grandmother managed to escape and call the police. After this incident, Mother was taken to a psychiatric facility with a mental health warrant based upon Grandmother's request.
Mother was involuntarily committed to the Harris County Psychiatric Center in July 1996 based upon a mental health warrant obtained by Grandmother. Grandmother testified that she never noticed a problem with Mother's mental health until Child started kindergarten and would wear the same clothes to kindergarten three days in a row. Grandmother testified that she obtained the mental health warrant after observing Mother's behavior after she was arrested.
While Mother was gone, Grandmother took care of Child with CPS approval, and instituted legal proceedings to take custody. At trial, Mother admitted she suffered from obsessive-compulsive disorder. CPS wanted to look at Mother's psychiatric record, but was unable to do so because Mother would not sign a release. The caseworker testified that living with Grandmother would be a better environment for Child.
Mother reported to CPS that Grandmother had physically abused her as a child and never took care of her. Mother testified that Grandmother bathed her and washed her private parts until she was in high school. She added that her father bathed her in the same manner until she was eleven. Mother explained that Grandmother kissed her neck and tucked her in bed every night until she was in college. Mother also testified that her father used to physically whip her until she was 21, even when Mother did not do anything wrong "just so [she] would remember what it would be like if [she] did misbehave."
Mother testified that her own grandmother had to make all her clothes, even in college, because her parents would not buy her any. Mother explained that Grandmother is a member of a cult and has tried to have demons cast out of her. Mother explained that she supported herself through school and that her parents never once gave her a present, including when she graduated from Baylor Law School.
Mother's father has passed away, and Grandmother denies all these charges. CPS did not pick up Child from Grandmother's home based on Mother's report to them because they felt Mother was not being truthful, and because Grandmother already had obtained legal temporary possession.
Mother testified that she would rather see her son placed in foster care than with Grandmother. Mother explained that she is worried that Grandmother does not know how to take care of a child, even though Grandmother has taken parenting classes. Mother testified she did not believe Grandmother could properly supervise Child because she was physically ill, *320 and Mother was worried about Grandmother taking Child back and forth to school. But Grandmother testified that, although she was 71 years old, she was in generally good health, with the exception of some high blood pressure problems. Mother also explained that Grandmother still practices and believes in faith healing, and so Child may not get taken to the doctor. However, Grandmother testified that she obtained health insurance for Child through Medicaid and has taken him to the doctor before. Mother was also concerned that Child would have access to the loaded guns that were kept at Grandmother's house.
Grandmother's witnesses testified that Child's relationship with Grandmother was very loving. But Mother's witnesses also testified that the relationship with Mother was loving and nurturing.
The evidence shows that Child has expressed a desire to live with Grandmother. Mother believes this is because Grandmother has a computer and a Jacuzzi and permits Child to stay up late, not because Grandmother is the better guardian. Father testified that, although he had not talked to Mother in a long time, he knew that Grandmother allowed Child to play violent video games. In addition, Father explained that Child had taken it upon himself to protect Grandmother. As Father explained, "He [Child] has told me his grandmother is old, that she might need him."
Child's teacher testified that he had a loving relationship with Grandmother, and that he viewed her as a mother figure. His teacher also explained that Child had told her he was afraid of his Mother, and that his Mother had attacked him with a knife in the past. The teacher explained that, when Child began having behavioral problems at school, she met with the Grandmother and talked to her about discipline. Grandmother and the teacher made a contract with Child, and every night, based on his behavior each day, he would be rewarded. This approach has worked; the teacher explained "he's doing wonderful" [sic] and "his behavior has improved." He is in the gifted and talented program at school, and he sees the school counselor every week.
Grandmother believes that her daughter, Mother, is mentally disturbed. Grandmother wants custody to insure Child will not be harmed mentally or physically, but Grandmother also wants to encourage Child to have a good relationship with Mother. Grandmother testified she makes about $38,000 a year in income from pensions, social security, and playing piano at the church. Upon cross-examination, Grandmother admitted she has over half a million dollars in the bank and could have done more to help out with Mother's bleak financial situation. Mother makes only $200 a month and feels that she can adequately provide for Child's needs with child support and social security, since her rent is income based.

C. Analysis
In Texas, there is a strong presumption that the best interest of the child is served if a natural parent is awarded custody. See Brook v. Brook, 881 S.W.2d 297, 299 (Tex.1994). This parental presumption imposes a heavy burden on a non-parent seeking conservatorship. See In re W.G.W, 812 S.W.2d 409, 413 (Tex. App.Houston [1st Dist.] 1991, no writ). However, in custody matters, we should give great deference to the trial court's order because the judge faces the parties and witnesses. See Doyle v. Doyle, 955 S.W.2d 478, 481-82 (Tex.App.Austin 1997, no writ).
*321 The parental presumption may be rebutted by a non-parent if the court finds that appointment of the parent as managing conservator would not be in the best interest of the child because a parental appointment would significantly impair the child's physical health or emotional development. See In re M.W., 959 S.W.2d 661, 665 (Tex.App.Tyler 1997, writ denied). The non-parent must "prove by a preponderance of credible evidence that awarding custody to the parent would result in serious physical or emotional harm to the child." See id.; Brook, 881 S.W.2d at 298. There must be evidence of specific, identifiable behavior that the parent will cause harm to the child. See In re M.W., 959 S.W.2d at 665. Absent such specific evidence, general evidence that a non-parent would be a better custodian of the child is inadequate to rebut the parental presumption. See In re W.G.W., 812 S.W.2d at 413.
We uphold the trial court's finding that there was specific evidence that the retention of Mother as sole managing conservator would be detrimental to the welfare of the child and that the appointment of the new managing conservators would result in a positive improvement for the child. See TEX. FAM.CODE ANN. § 156.104 (Vernon 2000). There was specific evidence presented from a CPS worker about reports of physical abuse. The CPS worker testified the child was left alone at a church, dirty and hungry. Child's teacher testified Child was afraid of his mother and that she had attacked him with a knife. Child was made to take a bath with bleach, and Mother has displayed signs of violence. Based on the evidence in the record before us, we conclude that the evidence was factually sufficient to support the order granting three-way joint custody. Although there are varied accounts of certain events, the trial court is in the best position to observe the credibility and personalities of the witnesses, and, consequently, an abuse of discretion does not occur when a trial court bases its decision on conflicting evidence. See Valdez v. Valdez, 930 S.W.2d 725, 731 (Tex.App.Houston [1st Dist.] 1996, no writ).
Mother points out that several of appellees' witnesses did not have personal knowledge about the relationship between Child and Mother. However, the material time to consider a potential guardian's fitness is the present. See May v. May, 829 S.W.2d 373, 377 (Tex.App.Corpus Christi 1992, writ denied). Most of the witnesses had at least met Mother once, and all the witnesses who were called knew her when they testified.
Mother also relies on Lewelling v. Lewelling, a case in which the Texas Supreme Court reversed the trial court's modification of custody from a mother to the grandparents. 796 S.W.2d 164 (Tex. 1990). In Lewelling, the mother had only a little money and had twice been a patient in a state hospital. Ultimately, custody remained with the mother when the grandparents' motion to modify was denied. See id. at 166. The court held that a non-parent party seeking appointment as managing conservator has the heavy burden to establish that appointment of the parent would not be in the child's best interest. See id. In the case before us today, appellee Grandmother has met her Lewelling burden; the findings and evidence show that awarding sole custody to Mother would significantly impair Child's physical and emotional development.
We find that some evidence of substantive and probative character exists to support the trial court's decision, and that there was no abuse of discretion in the modification of custody order. See In re A.D.H, 979 S.W.2d at 447; Valdez, 930 *322 S.W.2d at 731. We overrule Mother's issue five.
2. Additional Findings of Fact and Conclusions of Law
In issue one, Mother argues that the trial court erred when it failed to issue Additional Findings of Fact and Conclusions of Law. On August 12, 1999, the trial court issued Findings of Fact and Conclusions of Law upon Mother's request.
In these original findings, the trial court found that Child's present environment presented "a serious question about his physical health or welfare" and that the present environment "may have significantly impaired his emotional development." The judge also found the appointment of Mother, Grandmother, and the Father as joint managing conservators would be in the best interest of Child and that the circumstances of Child and Mother, the sole managing conservator, had materially and substantially changed. Finally, the court found it would be in the best interest of Child if: (1) Mother did not have possession of the child for overnight visitation, and (2) Grandmother had the sole discretion to determine if Mother was mentally and physically capable of exercising her visitation.
Mother filed a Request for Additional Findings of Fact and Conclusions of Law, but the trial court never granted the request. In the request for additional findings, Mother asked the court to state the specific reasons for deviating from the standard possession order. Mother also asked the court to explain how the retention of Mother as sole managing conservator would be detrimental to the welfare of the child.
A trial court is required to file findings of fact and conclusions of law within 20 days after a timely request is made. See TEX.R. CIV. P. 297. Upon a party's timely request for additional findings, the trial court "shall file any additional or amended findings and conclusions that are appropriate." TEX.R. CIV. P. 298. (emphasis added). Additional findings are not required if the original findings of fact and conclusions of law "properly and succinctly relate the ultimate findings of fact and law necessary to apprise [the party] of adequate information for the preparation of his or her appeal." In re Marriage of Morris, 12 S.W.3d 877, 886 (Tex.App.Texarkana 2000, no pet.); see also, Finch v. Finch, 825 S.W.2d 218, 221 (Tex.App.Houston [1st Dist.] 1992, no writ). If the record indicates Mother did not suffer injury, the failure to make additional findings did not require a reversal. See Johnston v. McKinney American, Inc., 9 S.W.3d 271, 277 (Tex.App.Houston [14th Dist.] 1999, no pet.). Mother must show the trial court's refusal to file the requested additional findings caused the rendition of an improper judgment. See id. If the refusal to file additional findings does not prevent Mother from adequately presenting her argument on appeal, there is no reversible error. See ASAI v. Vanco Insulation Abatement, Inc., 932 S.W.2d 118, 122 (Tex.App.El Paso 1996, no writ).
Mother relies on Wagner v. Riske to show that the trial court is required to file additional findings upon request. See 142 Tex. 337, 178 S.W.2d 117, 119 (1944). The Wagner case is distinguishable because it interprets an old version of Rule 298. However, even the old version of the rule did not create an absolute requirement for a judge to file new findings upon request; it mandated that the judge file "other or amended findings and conclusions as may be proper." Id. (emphasis added).
Mother also cites Joseph v. Joseph, holding that an appellant is harmed by a trial court's failure to file findings of fact and *323 conclusions of law when a proper request is made. See 731 S.W.2d 597, 598 (Tex. App.Houston [14th Dist.] 1987, no writ). In Joseph, the trial court failed to file any findings of fact and conclusions of law, and the appellate court found the appellant was harmed and reversed. See id. Joseph is distinguishable because the case did not involve a request for additional findings.
Mother was able to adequately brief her case to this court without the issuance of additional findings. The evidence upon which the judge's ruling was based is clearly set out in the record before us. Mother has not established that the trial court's refusal to make the requested additional findings and conclusions prevented her from adequately presenting her case on appeal, and thus the issue is overruled. See Starcrest Trust v. Berry, 926 S.W.2d 343, 354 (Tex.App.Austin 1996, no writ) (citing Tamez v. Tamez, 822 S.W.2d 688, 693 (Tex.App.Corpus Christi 1991, writ denied)). We overrule issue one.
3. Allowing the Maternal Grandmother to Set Visitation
In issue two, Mother argues the trial court erred when it delegated the power of setting visitation between Mother and Child to Grandmother. We review the order[1] under the abuse of discretion standard. See Seidel, 10 S.W.3d at 368; Warchol, 853 S.W.2d at 167. A trial court abuses its discretion when "it acts in an arbitrary or unreasonable manner or when it acts without reference to any guiding principles." See Seidel, 10 S.W.3d at 368; see also Dennis v. Smith, 962 S.W.2d 67, 68 (Tex.App.Houston [1st Dist.] 1997, pet. denied).
Texas encourages frequent contact between a child and parent so that they may develop a close relationship. See TEX. FAM.CODE ANN. § 153.251 (Vernon 2000). The public policy of this state is to assure continuing contact with those parents "who have shown the ability to act in the best interest of the child." TEX. FAM. CODE ANN. § 153.001 (Vernon 2000). Trial courts have wide discretion in determining the best interest of the child. See Gillespie v. Gillespie, 644 S.W.2d 449, 451 (Tex. 1982). Thus, the trial court may place conditions on visitation if they are necessary for the best interest of the child. See Capello v. Capello, 922 S.W.2d 218 (Tex. App.San Antonio 1996, no writ).
Mother cites Roosth v. Roosth in support of her argument that the trial court's order was an abuse of discretion. See 889 S.W.2d 445 (Tex.App.Houston [14th Dist.] 1994, writ denied). In Roosth, the appellate court found an order giving a mother the right to determine when, where, and if a father could have possession or access to the children was an abuse of discretion because it did not state in clear and unambiguous terms what the father had to do to see his children. See id. at 452. We do not disagree with the reasoning in Roosth; however, we find it is factually distinguishable. In Roosth, there was no evidence suggesting that visitation would endanger the physical or emotional welfare of the children. See id. Because we have already upheld the trial court's finding that there was specific evidence suggesting it would be detrimental to the welfare of the child if Mother was retained as sole managing conservator, Roosth does not apply.
*324 Mother was named a joint managing conservator. A joint managing conservator who is not awarded primary physical custody is generally given a minimum amount of time for possession in a standard possession order. Tex. Fam.Code Ann. § 153.137 (Vernon 2000). Placing conditions on Mother's right to visit is not an abuse of discretion because the trial court found the conditions would be in the best interest of the child. Cf. Thompson v. Thompson, 827 S.W.2d 563, 570 (Tex. App.Corpus Christi 1992, writ denied) (finding the trial court abused its discretion when it gave a parent possession of the child only during the summer months because it did not find only summer possession was in the best interest of the child). The court found it would be in the best interest of the child if: (1) Mother did not have possession for overnight visitation; and (2) if Grandmother had the sole discretion to determine when Mother was capable of exercising visitation. The trial court did not deny Mother visitation rights; the court merely granted Mother the right to visit under proper limitations and safeguards. If Grandmother abuses her power to evaluate whether or not Mother is in an appropriate condition to visit with Child, Mother can file another Motion to Modify. The trial court has broad discretion in finding what is in the best interest of the child and has the authority to monitor the situation and modify the visitation order if necessary. Under these circumstances, we find no abuse of discretion, and we overrule issue two.
4. The Constitutional Right of a Mother to Raise her Son
In issue three, Mother suggests the trial court's order violates the constitutional right of a mother to raise her son. Mother relies on the Due Process Clause of the Fourteenth Amendment to the Federal Constitution to argue that a mother has the right to raise her child. But, Mother was not denied due process of law or the equal protection of the laws. See In re H.D.O., 580 S.W.2d 421, 424 (Tex.Civ. App.Eastland 1979, no writ) (holding the "best interest of the child" standard does not violate federal constitutional principles).
Mother also relies on Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 2059, 147 L.Ed.2d 49 (2000). In Troxel, the United States Supreme Court recognized that parents have a liberty interest in the care, custody, and control of their children. See id. at 2060-61. In the case before us, the trial court granted Mother status as joint managing conservator and did not violate Mother's liberty interest. Mother was awarded the right to receive information about the health, education, and welfare of Child, the right of access to Child's records, the right to consent to medical treatment, the right to attend Child's school activities, and the right to direct the moral and religious training of Child, as required by the United States Supreme Court in Troxel. See id. Furthermore, unlike in the case before us today, Troxel specifically applies to visitation cases in which there has been no allegation that the parent is unfit. See id. at 2061.
Mother's liberty interest has not been violated. We overrule issue three.
5. Standing
In issue four, Mother contends Grandmother lacked standing to sue for custody. Any person with substantial past contact with the child may intervene in a pending suit. See In re Hidalgo, 938 S.W.2d 492, 495-96 (Tex.App.Texarkana 1996, no writ). Furthermore, the Texas Family Code specifically gives grandparents the right to sue for custody. See TEX. FAM.CODE ANN. § 102.004 (Vernon 2000).
*325 A suit requesting managing conservatorship may be filed by a grandparent as necessary when "the child's present environment presents a serious question concerning the child's physical health or welfare." Id. The court must make a threshold finding of serious and immediate concern for the welfare of the child based upon a preponderance of the evidence before grandparents will have the right to sue for custody. See Von Behren v. Von Behren, 800 S.W.2d 919, 921 (Tex.App.San Antonio 1990, writ denied). The Texas Supreme Court has held that a child must be in imminent danger of physical or emotional harm for there to be a serious question concerning the child's physical health or welfare. See McElreath v. Stewart, 545 S.W.2d 955, 958 (Tex.1977).
The trial court stated in its conclusions of law that the grandmother had standing to bring this action under Chapter 102 of the Texas Family Code. The trial court also made a conclusion of law that there was a seriousness and immediacy of harm arising from Child's environment with Mother. The evidence in the record supports this conclusion of law. CPS workers testified that it would be in the best interest of the child to be placed with his grandmother. Thus, we conclude that Grandmother had standing to bring this suit to remove Mother from being the sole managing conservator. We overrule issue four.
6. Attorney's Fees
Finally, Mother argues that the trial court erred in awarding attorney's fees against her to the attorney ad litem for the child. The trial court awarded attorney's fees to the attorney ad litem for the child in the amount of $7,500. The judgment was awarded jointly and severally against Mother, Father, and Grandmother in the amount of $5,000, and an additional judgment against Mother and Father for $2,500. The award of attorney's fees is reviewed under an abuse of discretion standard. See ASAI, 932 S.W.2d at 123. Reasonableness of attorney's fees must be supported by competent evidence. See id.
The Texas Family Code awards reasonable attorney's fees to an attorney appointed to represent a child. See TEX. FAM. CODE ANN. § 107.015 (Vernon 2000). Mother argues no evidence of reasonableness was presented; the attorney merely introduced a list of his charges, but there was no evidence that the charges were reasonable, necessary, or customary in the area. She argues that recovery of attorney's fees should be denied absent a showing that the fees were reasonable.
The ad litem attorney offered evidence of a summary of his services, and the judge gave him a judgment for the fees without determining the fees were reasonable. We find the trial court could reasonably infer from the testimony on attorney's fees and the list of the ad litem's services that the amount of time spent on this case and the dollar figure requested was reasonable, necessary, and customary. See, e.g., Villalpando v. De La Garza, 793 S.W.2d 274, 278 (Tex.App.Corpus Christi 1990, no writ).
In her reply brief, Mother argues her testimony proved she was indigent as a matter of law. Under the Texas Family Code, an indigent parent will not have to pay ad litem attorney's fees and, instead, they will be paid by the other parties or the county. TEX. FAM.CODE ANN. § 107.015(b)-(c) (Vernon 2000). Mother makes about $200 a month and receives partial rent payment from the federal government. The fact that Mother is presently receiving a governmental entitlement based upon indigency is prima facie evidence that Mother is indigent. See, e.g., *326 Clark v. Dearen, 715 S.W.2d 364, 368 (Tex. App.Houston [1st Dist.] 1986, no writ). The trial court only has authority to order a non-indigent parent to pay ad litem fees. See, e.g., Moore v. Moore, 898 S.W.2d 355, 359 (Tex.App.San Antonio 1995, no writ); Villalpando, 793 S.W.2d at 278. Thus, the trial court properly charged the ad litem fees against Father and Grandmother, but erred in charging the ad litem costs against Mother when her indigent status had been established. We sustain appellant's issue six.

Conclusion
We reverse the judgment of the trial court with respect to attorney's fees in part and set aside the award of attorney's fees against Mother. In all other respects, we affirm the judgment of the trial court.
NOTES
[1] The order awards to the mother "possession of the child at times mutually agreed to in writing and in advance by D.E. and R.D.E. and, in the absence of mutual agreement, subject to the sole discretion of D.E. to determine that R.D.E. is mentally and physically capable of properly exercising her visitation with the child" at specified dates and times as set out in the order.