In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-02-00082-CR


______________________________




ANDREW ONEAL CAMPBELL, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 262nd Judicial District Court


Harris County, Texas


Trial Court No. 892041




 




Before Morriss, C.J., Grant and Ross, JJ.


Opinion by Justice Ross



O P I N I O N



 Andrew Oneal Campbell pled guilty to possession of cocaine weighing more than
one gram but less than four grams with intent to deliver. This charge was originally
enhanced by two previous felony convictions. Campbell entered into a plea agreement
with the State whereby the State agreed to abandon one of the enhancements in return
for Campbell's guilty plea and to recommend his punishment be assessed at twenty years'
confinement. The trial court accepted Campbell's plea and sentenced him to twenty years'
confinement. Campbell filed a notice of appeal pro se, complaining only that the court
suppressed evidence. (1) Because no reporter's record was filed in this case, our analysis
is based solely on the clerk's record. 

 Campbell's appointed attorney on appeal filed an Anders brief, acknowledging that
proper notice of appeal pursuant to Texas Rule of Appellate Procedure 25.2(b)(3) was not
given. See Anders v. California, 386 U.S. 738 (1967). After a plea of guilty pursuant to a
plea agreement and a sentence within the range of the agreement, a notice of appeal
must: (1) specify the appeal is for a jurisdictional defect; (2) specify the substance of the
appeal was raised by written motion and ruled on before trial; or (3) state the trial court
granted permission to appeal. Tex. R. App. P. 25.2(b)(3). The record in this case does not
show: (1) a jurisdictional defect; (2) that there were written motions filed or ruled on; or (3)
that the trial court granted permission to appeal. 

 Campbell filed a response pro se to the Anders brief in which he contends that his
plea was involuntary and that his trial counsel was ineffective. He also contends the trial
court did not follow the plea agreement. 

 Because Campbell did not meet the requirements of Tex. R. App. P. 25.2(b)(3) in
his notice of appeal, he failed to invoke the jurisdiction of this Court. However, even if our
jurisdiction had been properly invoked, the record does not support any of Campbell's
contentions. 

 The Texas Court of Criminal Appeals has held that a plea-bargaining defendant may
not appeal the voluntariness of the plea. Cooper v. State, 45 S.W.3d 77 (Tex. Crim. App.
2001). The court in Cooper also stated that meritorious claims of involuntary pleas may
be raised by other procedures, such as by writ of habeas corpus. Id. at 82. 

 The Texas Court of Criminal Appeals has also recognized that a reviewing court will
only rarely be provided with a record capable of providing a fair evaluation of the merits of
a claim of ineffective assistance of counsel. Thompson v. State, 9 S.W.3d 808, 813 (Tex.
Crim. App. 1999); Jackson v. State, 973 S.W.2d 954, 957 (Tex. Crim. App. 1998). To
defeat the presumption of reasonable professional assistance, "[a]ny allegation of
ineffectiveness must be firmly founded in the record and the record must affirmatively
demonstrate the alleged ineffectiveness." McFarland v. State, 928 S.W.2d 482, 500 (Tex.
Crim. App. 1996). In such a case, where the alleged derelictions primarily are errors of
omission outside the record rather than commission revealed in the trial record, habeas
corpus may be the vehicle by which a thorough and detailed examination of alleged
ineffectiveness may be developed. Jackson, 973 S.W.2d at 957. 

 The appeal is dismissed for want of jurisdiction.


 Donald R. Ross

 Justice


Date Submitted: October 17, 2002

Date Decided: October 18, 2002


Do Not Publish

1. This contention is not supported by the record.


he child's
physical health or emotional development, a parent shall be appointed sole managing conservator
or both parents shall be appointed as joint managing conservators of the child." Tex. Fam. Code
Ann. § 153.131(a) (Vernon 2008). A finding that a nonparent is to be appointed as a managing
conservator must be supported by a preponderance of the evidence. See In re De La Pena, 999
S.W.3d 521, 527-28 (Tex. App.--El Paso 1999, no pet.). A finding that appointment of a parent
as managing conservator would significantly impair the child's physical health or emotional
development is governed by a preponderance of the evidence standard. Tex. Fam. Code Ann.
§ 105.005 (Vernon 2008); see Lewelling v. Lewelling, 796 S.W.2d 164, 167 (Tex. 1990). (3)

 Mary also asserts two points of error challenging the legal and factual sufficiency of the
evidence, respectively. A trial court has broad discretion in deciding the issue of conservatorship
modification and will not be reversed absent a clear abuse of discretion. In re R.D.Y., 51 S.W.3d
314, 317-18 (Tex. App.--Houston [1st Dist.] 2001), pet. denied, 92 S.W.3d 433 (Tex. 2002) (citing
Seidel v. Seidel, 10 S.W.3d 365, 368 (Tex. App.--Dallas 1999, no pet.)). In conservatorship cases,
factual insufficiency is not an independent ground for asserting error; however, it is relevant in
determining if the trial court abused its discretion. Id. (citing Seidel, 10 S.W.3d at 368). The factual
sufficiency standard used in reviewing the sufficiency of a jury verdict is also used in reviewing a
trial court's findings of fact. Id. at 318 (citing Seidel, 10 S.W.3d at 368). After examining all the
evidence, we will only set aside the trial court's findings if they are so against the great weight of the
evidence that they are clearly wrong and unjust. Id. Under an abuse of discretion standard, the legal
and factual sufficiency of the evidence are not independent grounds of error, but are relevant facts
in assessing whether the trial court abused its discretion. In re Ferguson, 927 S.W.2d 766, 769 (Tex.
App.--Texarkana 1996, no writ).

IV. Trial Court's Findings, Conclusions

 The trial court made the following findings and conclusions: 

 7. Although legally divorced on September 7, 2004, Jeff and Mary Frey
continued an off and on relationship, including residing in the same residence
at times, until May, 2007.


 8 [H.N.M.] has continuously resided with Jeff Frey since at least May, 2007.


 9. The Court granted temporary managing conservatorship of the child,
[H.N.M.], to the Department on October 10, 2007. The Court found that Jeff
Frey was willing and able to provide the child with a safe environment and
that continued placement of the child with Jeff Frey was in the child's best
interest.


 . . . .


 16. Mary Frey completed her parenting classes and had a psychological
evaluation.


 17. Mary Frey did not complete her counseling as ordered by the Court.


 18. Mary Frey did not regularly attend scheduled visitation with the child,
[H.N.M.].


 19. Mary Frey did not appear for random drug testing at the time ordered by the
Court.


 20. Mary Frey tested positive for methamphetamines [sic] on February 14, 2008,
during the pendency of this suit.


 . . . .


 22. Mary Frey engaged in conduct that endangered the physical or emotional
well-being of [H.N.M.].


 23. [H.N.M.] expressed the desire to remain in the care of Jeff Frey, with whom
she feels safe and well cared for. She wants to reside with her sibling,
[J.D.F.]. [H.N.M.] also indicated to the Court she was fearful of residing
with her mother, Mary Frey. 


 [Conclusions of Law]


 . . . .


 5. The appointment of Mary Frey and Jeff Frey as joint managing conservators
is in the best interest of [H.N.M.].


 6. There was a preponderance of evidence to support the appointment of a
nonparent as a joint managing conservator of the child.


 7. The appointment of Jeff Frey as the managing conservator with the right to
designate the primary residence of the child is in the best interest of
[H.N.M.].


 . . . .


 10. There was a preponderance of evidence that Mary Frey engaged in conduct
that endangered the physical and emotional well-being of [H.N.M.].


V. Evidence to Overcome the Parental Presumption 

 To meet its burden to prove that naming Mary as sole managing conservator would
significantly impair the child's physical health or emotional development, the Department presented
Ronikaye Rusak, a licensed professional counselor, who had counseled H.N.M. for twenty-eight
sessions over the year before trial. Her testimony was:

 (1) H.N.M. described to Rusak several "drunk men" who spent time with Mary and
H.N.M. One of these "drunk men" took H.N.M. to a pond, and H.N.M. then "shut down" on Rusak
and did not describe what happened next. H.N.M. told of a man named Matt who attempted to take
H.N.M. into a public restroom until a bystander intervened. Matt told the bystander H.N.M. was his
child, and H.N.M. told the bystander that was not true. 

 (2) H.N.M. does not feel safe with Mary. 

 (3) H.N.M. appears to have post-traumatic stress syndrome based on a chaotic home life. 
 (4) As related by Rusak, H.N.M. had said that Mary would beg for money from men, and
H.N.M. was cared for by the "drunk men," not Mary, who at times slept through her visitation times
with H.N.M. Mary does not take care of H.N.M., the drunk men do. 

 (5) As an example of why she felt the child would be in physical danger if placed with
Mary, Rusak cited H.N.M.'s statement that Mary sometimes slept during visitation periods. Further,
if H.N.M. and her half-brother were to prepare meals, they would need someone to "make sure that
they turn the stove off and things like that." 

 (6) She recommended that Jeff, not Mary, be named managing conservator of H.N.M.
and that Mary's visitation with the child should be supervised. 

 Sarah Martin, an investigator for the Department, received an assignment concerning an
altercation between Mary and her father May 7, 2007, while her children were present. This began
an investigation of Mary's mental status as well as drug usage. Mary admitted she used
methamphetamine, but had been sober for three weeks. A drug test was arranged, but Mary refused
to participate and stated that she was "no longer willing to incriminate herself." Mary admitted
having overdosed on medication, admitting herself into Texoma Behavioral Center, and being
released with a diagnosis of bipolar disorder. Martin testified Mary stated that the stress of the
custody battle caused her to attempt to commit suicide. 

 Mary testified she received treatment at a mental health facility and was diagnosed as bipolar. 
She testified she had quit taking the medications prescribed to treat her condition because she did
not like how the medications made her feel. Mary did testify, though, that she had obtained a
different prescription and was currently taking those medications. The Department alleged Mary had
failed to adequately follow discharge plans for her mental condition, but there was no evidence of
any specific plans or how Mary had failed to comply. She did, though, admit that while she claimed
to be taking medications for her bipolar condition, she did not attend counseling because she was
"okay." 

 In February 2008, Mary tested positive for methamphetamine use; she denied using drugs
and later claimed that her prescription medications caused the positive drug test. In addition to the
positive drug test, Mary's brother-in-law, Charles Whitten, testified that at some point in the summer
of 2008, he was called to Mary's home in Midlothian to bring her back from a dispute of some kind
with her boyfriend. Whitten said that in Mary's bag he found crack pipes and lighters. After
bringing Mary to the Whitten home in Paris, Mary got in a fight with her sister and left the house. 
Mary was taken to jail on criminal trespass charges. 

 John Watkins, the temporary program director for the Department at the time of their
investigation, told the trial court that H.N.M. and her half-brother have a very strong bond, and the
trial court should consider emotional and mental damage to the child which would be inflicted on
H.N.M. if she were separated from her sibling. 

 Also, the trial court apparently interviewed H.N.M. privately as authorized by Section
153.009 of the Texas Family Code. No record has been presented of the interview, and no request
for one was made. But the trial court included in its findings of fact the following: "[H.N.M.]
expressed the desire to remain in the care of Jeff Frey, with whom she feels safe and well cared for. 
She wants to reside with her sibling, [J.D.F.]. [H.N.M.] also indicated to the Court she was fearful
of residing with her mother, Mary Frey." 

 There was evidence Mary either exposed or left the child in the care of "drunk men." Mary
had been diagnosed as bipolar a little more than a year before trial, although according to her she was
taking medications to manage that condition. Although Mary mentioned her treatment and
diagnosis, she did not detail what led to her treatment in a Denison area hospital, where she received
the diagnosis of bipolar disorder. However, Sarah Martin, a Department investigator, testified Mary
told her she had attempted suicide because of the stress of the Department action and some criminal
investigation. The counselor who had worked extensively with the child testified that the child did
not feel safe in Mary's care and that the child said she would feel safe if a Department worker
supervised visitations. Those statements by H.N.M. to counselor Rusak were made about one month
before trial. We cannot say the trial court abused its discretion in finding that a preponderance of
the evidence showed that Mary had "engaged in conduct that endangered the physical and emotional
well-being of" the child. Put another way, the evidence is legally and factually sufficient to
overcome the parental presumption and support the trial court's decision to name Jeff and Mary as
joint managing conservators, rather than Mary as the sole managing conservator. 

VI. Best Interest of the Child 

 The trial court made a specific conclusion of law that allowing Jeff to determine H.N.M.'s
primary residence would be in the child's best interest. While Section 153.131 instructs on the
standard for appointing a nonparent as managing conservator, the trial court's decisions are also
governed by Section 153.002, which mandates that "[t]he best interest of the child shall always be
the primary consideration . . . in determining the issues of conservatorship and possession of and
access to the child." Tex. Fam. Code Ann. § 153.002 (Vernon 2008). Trial courts have broad
discretion to determine what is in a child's best interest; we review a trial court's decision regarding
child custody, control, and possession matters for a clear abuse of discretion. Gillespie, 644 S.W.2d
at 451; see also In re Marriage of Ellis, No. 06-08-00012-CV, 2008 Tex. App. LEXIS 6289 (Tex.
App.--Texarkana Aug. 19, 2008, no pet.) (mem. op.) (some evidence to support trial court ruling
giving mother right to determine primary residence of child; "The trial court's ruling was within the
range of reasonable disagreement and was not arbitrary or capricious. As such, the ruling was not
an abuse of discretion.").

 While Mary goes to great lengths to point out Jeff's shortcomings, the trial court was in the
best position to view each witness' demeanor and credibility. There was evidence adduced that Jeff
had a history of drug abuse; Jeff admitted that "in my past" he had delivered drugs. However, there
was also evidence that H.N.M. considered Jeff to be her father and that he was the only father she
had known. Testimony showed that H.N.M. had lived with Jeff at least since May 2007. As
mentioned above, the child told Rusak that she did not feel safe with Mary and would have wanted
a Department worker to supervise visitations with Mary. The child apparently expressed to the court
that she did not feel safe with Mary. She also told at least two witnesses--Rusak and CASA
volunteer Sharon Eubanks--that she wanted to stay with Jeff. Rusak testified that on the many
occasions when Mary would fail to show up for visitations with H.N.M., the child became angry,
stressed, and afraid. Rusak described a pattern where, after a period of no visits from Mary, on
reinstatement of visitations, H.N.M. demonstrated defiance and fighting with her brother at home;
then, when Mary did not visit for a period of time, H.N.M.'s behavior improved. 

 Also, while the trial court made a finding of fact that Mary had completed parenting classes,
testimony at trial was that she had only attended one or two classes, apparently in September 2007,
and there was testimony that as of April 2008 she had not attended parenting classes. 

 Jeff attended the parenting classes even though he was not required by the Department to do
so. He also went to eight to ten therapy sessions with Rusak, to address both his stress over court
proceedings and how to help the two children "heal from their experiences." Martin testified that
she made several visits to Jeff's home and that the children seemed well cared for. Martin said
H.N.M. calls Jeff "Daddy" and enjoys staying with him. The child's therapist and the Department
supervisor, Melinda Johnson, both recommended to the trial court that Jeff be named sole managing
conservator and that the child should not be placed with Mary. Johnson specifically stated that
placement with Jeff was in the child's best interest. Johnson's recommendation was based on Jeff's
history: the child lived with Jeff before the Department's involvement; he had been making sure the
child got to school (which she attended regularly and did well in), medical appointments, and
counseling for at least a year. Additionally, under direct questioning from the trial court, John
Watkins, the temporary program director for the Department at the time of its investigation, told the
trial court that H.N.M. and her half-brother have a very strong bond, and the trial court should
consider emotional and mental damage to the child which would be inflicted on H.N.M. if she were
separated from her sibling. 

 Based on the totality of evidence, we cannot say the trial court abused its discretion in
determining that it was in the child's best interest to appoint Jeff as a joint managing conservator 
with the right to determine the child's primary residence. 

 We affirm the judgment of the trial court. 



 Jack Carter

 Justice


Date Submitted: September 16, 2009

Date Decided: October 21, 2009

 
1. Mary's points of error claim: 1) the trial court abused its discretion in naming Jeff, a
nonparent, as a joint managing conservator; 2) the evidence was legally insufficient to "take custody
from a mother" and give "custody" to a nonparent; and 3) the evidence was factually insufficient to
"take custody from a mother" and give "custody" to a nonparent. Another point of error asks whether
the "parental presumption" of Section 153.131 of the Texas Family Code applies to a suit affecting
the parent-child relationship filed by the Texas Department of Family Services. The Department
agrees the "presumption" applies, and neither side discusses the issue. 
2. Jeff never formally intervened in the suit. During the pendency of the suit, the Department
had been named temporary managing conservator and the child had been placed with Jeff. At trial,
the Department urged that Jeff be named as the managing conservator of the child. On the final
hearing, the trial court has the discretion to appoint a "relative" or "another person" as managing
conservator. We are not addressing whether that person must formally intervene and be subject to
challenge on such intervention, as that is not a point of error. See Tex. Fam. Code Ann.
§§ 263.404(2) (Vernon 2008), 102.003-.004 (Vernon Supp. 2009). 
3. The parties agree that the trial court's order giving Jeff the right to determine the child's
primary residence must rest on a preponderance of the evidence that allowing Mary to determine
residence would "significantly impair the child's physical health or emotional development." Tex.
Fam. Code Ann. § 153.131(a). See De La Pena, 999 S.W.2d 521. But cf. Gardner v. Gardner, 229
S.W.3d 747, 752-53 (Tex. App.--San Antonio 2007, no pet.) (Because Section 153.131 only
specifically addresses conservatorship, its heightened burden does not apply to decisions on which
conservator is to determine primary residence; rather, that decision must only be established by a
determination of the child's best interest.).