

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

## No. 06-08-00136-CV
_____

IN THE INTEREST OF
H. N. M., A CHILD

On Appeal from the 6th Judicial District Court
Lamar County, Texas
Trial Court No. 76663

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Carter

MEMORANDUM OPINION

## I.    Summary of Proceedings

Mary Frey challenges the trial court's order which named her and her ex-husband, Jeff Frey, joint managing conservators of Mary's daughter, H.N.M. Jeff had no legal relationship to the child, although there was evidence the child had lived for substantial periods of time with Jeff during and after the two-to-four-year marriage of Mary and Jeff. Evidence was presented that H.N.M. lived with Jeff and H.N.M.'s half-brother, J.D.F. (the child of Mary and Jeff) for two and a half months before the Texas Department of Family and Protective Services (the Department) became involved in May 2007. H.N.M., eight years old at the time of trial, lived with Jeff throughout the sixteen months between the Department's initial investigation and trial. The trial court order gave Jeff the right to determine H.N.M.'s primary residence, and Mary was granted standard possession and access to the child. TEX. FAM. CODE ANN. §§ 153.311–.317 (Vernon 2008 & Supp. 2009). Mary's appeal presents four points of error,[1] which essentially argue that the trial court abused its discretion in

---

[1]Mary's points of error claim: 1) the trial court abused its discretion in naming Jeff, a nonparent, as a joint managing conservator; 2) the evidence was legally insufficient to "take custody from a mother" and give "custody" to a nonparent; and 3) the evidence was factually insufficient to "take custody from a mother" and give "custody" to a nonparent. Another point of error asks whether the "parental presumption" of Section 153.131 of the Texas Family Code applies to a suit affecting the parent-child relationship filed by the Texas Department of Family Services. The Department agrees the "presumption" applies, and neither side discusses the issue.

naming nonparent Jeff joint managing conservator and giving Jeff the right to determine the child's primary residence.[2]

## II.    Factual History

About May 7, 2007, the Department began investigating a report of "Neglectful Supervision and Physical Abuse" of H.N.M. and her half-brother, J.D.F.  Mary was reported to be in a physical fight with her father at Jeff's home.  H.N.M. and J.D.F. reportedly were frightened and hiding in a bathroom while Mary and her father fought outside.  The Department began implementing family-based services; after a few months of minimal compliance on Mary's part (there is no question H.N.M. continued to live with Jeff and J.D.F. during this period), the trial court, in September 2007, instructed the Department to seek temporary managing conservatorship of H.N.M.  The Department was named temporary managing conservator of the child in October 2007.  The Department sought termination of the parental rights of Mary and H.N.M.'s biological father, Lonnie M.  In October 2008, incident to issuing its order in this case, the trial court dismissed the State from involvement in the case and consolidated the case with the earlier divorce action between Jeff and Mary.

---

[2]Jeff never formally intervened in the suit.  During the pendency of the suit, the Department had been named temporary managing conservator and the child had been placed with Jeff.  At trial, the Department urged that Jeff be named as the managing conservator of the child.  On the final hearing, the trial court has the discretion to appoint a "relative" or "another person" as managing conservator.  We are not addressing whether that person must formally intervene and be subject to challenge on such intervention, as that is not a point of error.  *See* TEX. FAM. CODE ANN. §§ 263.404(2) (Vernon 2008), 102.003–.004 (Vernon Supp. 2009).

3

### III.    Standard of Review

A trial court's order regarding conservatorship is reviewed under an abuse of discretion standard. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). A trial court abuses its discretion if it acts arbitrarily and unreasonably or without reference to any guiding principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). The trial court is in the best position to observe the demeanor and personalities of the witnesses and can "feel" the forces, powers, and influences that cannot be discerned by merely reading the record. *Bates v. Tesar*, 81 S.W.3d 411, 424 (Tex. App.—El Paso 2002, no pet.); *Jenkins v. Jenkins*, 16 S.W.3d 473, 477 (Tex. App.—El Paso 2000, no pet.). Thus, an abuse of discretion does not occur if some evidence of a substantive and probative character exists to support the trial court's decision. *Bates*, 81 S.W.3d at 424–25; *Jenkins*, 16 S.W.3d at 477. Mary cites *Taylor v. Taylor*, 254 S.W.3d 527, 536 (Tex. App.—Houston [1st Dist.] 2008, no pet.), for the proposition that "close calls" in disputes over conservatorship between a parent and nonparent should be decided in favor of the parent. However, Mary does not explain how to reconcile this "close call" standard with the abuse of discretion standard.

In the present case, the trial court named a nonparent, Jeff, joint managing conservator along with parent Mary. "[U]nless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator

or both parents shall be appointed as joint managing conservators of the child." TEX. FAM. CODE ANN. § 153.131(a) (Vernon 2008). A finding that a nonparent is to be appointed as a managing conservator must be supported by a preponderance of the evidence. *See In re De La Pena*, 999 S.W.3d 521, 527–28 (Tex. App.—El Paso 1999, no pet.). A finding that appointment of a parent as managing conservator would significantly impair the child's physical health or emotional development is governed by a preponderance of the evidence standard. TEX. FAM. CODE ANN. § 105.005 (Vernon 2008); *see Lewelling v. Lewelling*, 796 S.W.2d 164, 167 (Tex. 1990).[3]

Mary also asserts two points of error challenging the legal and factual sufficiency of the evidence, respectively. A trial court has broad discretion in deciding the issue of conservatorship modification and will not be reversed absent a clear abuse of discretion. *In re R.D.Y.*, 51 S.W.3d 314, 317–18 (Tex. App.—Houston [1st Dist.] 2001), *pet. denied*, 92 S.W.3d 433 (Tex. 2002) (citing *Seidel v. Seidel*, 10 S.W.3d 365, 368 (Tex. App.—Dallas 1999, no pet.)). In conservatorship cases, factual insufficiency is not an independent ground for asserting error; however, it is relevant in determining if the trial court abused its discretion. *Id.* (citing *Seidel*, 10 S.W.3d at 368). The factual sufficiency standard used in reviewing the sufficiency of a jury verdict is also used in reviewing a

---

[3]The parties agree that the trial court's order giving Jeff the right to determine the child's primary residence must rest on a preponderance of the evidence that allowing Mary to determine residence would "significantly impair the child's physical health or emotional development." TEX. FAM. CODE ANN. § 153.131(a). *See De La Pena*, 999 S.W.2d 521. *But cf. Gardner v. Gardner*, 229 S.W.3d 747, 752–53 (Tex. App.—San Antonio 2007, no pet.) (Because Section 153.131 only specifically addresses conservatorship, its heightened burden does not apply to decisions on which conservator is to determine primary residence; rather, that decision must only be established by a determination of the child's best interest.).

trial court's findings of fact. *Id.* at 318 (citing *Seidel*, 10 S.W.3d at 368). After examining all the evidence, we will only set aside the trial court's findings if they are so against the great weight of the evidence that they are clearly wrong and unjust. *Id.* Under an abuse of discretion standard, the legal and factual sufficiency of the evidence are not independent grounds of error, but are relevant facts in assessing whether the trial court abused its discretion. *In re Ferguson*, 927 S.W.2d 766, 769 (Tex. App.—Texarkana 1996, no writ).

## IV. Trial Court's Findings, Conclusions

The trial court made the following findings and conclusions:

7.    Although legally divorced on September 7, 2004, Jeff and Mary Frey continued an off and on relationship, including residing in the same residence at times, until May, 2007.

8    [H.N.M.] has continuously resided with Jeff Frey since at least May, 2007.

9.    The Court granted temporary managing conservatorship of the child, [H.N.M.], to the Department on October 10, 2007. The Court found that Jeff Frey was willing and able to provide the child with a safe environment and that continued placement of the child with Jeff Frey was in the child's best interest.

. . . .

16.    Mary Frey completed her parenting classes and had a psychological evaluation.

17.    Mary Frey did not complete her counseling as ordered by the Court.

18.    Mary Frey did not regularly attend scheduled visitation with the child, [H.N.M.].

6

19. Mary Frey did not appear for random drug testing at the time ordered by the Court.

20. Mary Frey tested positive for methamphetamines [sic] on February 14, 2008, during the pendency of this suit.

. . . .

22. Mary Frey engaged in conduct that endangered the physical or emotional well-being of [H.N.M.].

23. [H.N.M.] expressed the desire to remain in the care of Jeff Frey, with whom she feels safe and well cared for. She wants to reside with her sibling, [J.D.F.]. [H.N.M.] also indicated to the Court she was fearful of residing with her mother, Mary Frey.

[Conclusions of Law]

. . . .

5. The appointment of Mary Frey and Jeff Frey as joint managing conservators is in the best interest of [H.N.M.].

6. There was a preponderance of evidence to support the appointment of a nonparent as a joint managing conservator of the child.

7. The appointment of Jeff Frey as the managing conservator with the right to designate the primary residence of the child is in the best interest of [H.N.M.].

. . . .

10. There was a preponderance of evidence that Mary Frey engaged in conduct that endangered the physical and emotional well-being of [H.N.M.].

7

## V.     Evidence to Overcome the Parental Presumption

To meet its burden to prove that naming Mary as sole managing conservator would significantly impair the child's physical health or emotional development, the Department presented Ronikaye Rusak, a licensed professional counselor, who had counseled H.N.M. for twenty-eight sessions over the year before trial.  Her testimony was:

(1)     H.N.M. described to Rusak several "drunk men" who spent time with Mary and H.N.M.  One of these "drunk men" took H.N.M. to a pond, and H.N.M. then "shut down" on Rusak and did not describe what happened next.  H.N.M. told of a man named Matt who attempted to take H.N.M. into a public restroom until a bystander intervened.  Matt told the bystander H.N.M. was his child, and H.N.M. told the bystander that was not true.

(2)     H.N.M. does not feel safe with Mary.

(3)     H.N.M. appears to have post-traumatic stress syndrome based on a chaotic home life.

(4)     As related by Rusak, H.N.M. had said that Mary would beg for money from men, and H.N.M. was cared for by the "drunk men," not Mary, who at times slept through her visitation times with H.N.M.  Mary does not take care of H.N.M., the drunk men do.

(5)     As an example of why she felt the child would be in physical danger if placed with Mary, Rusak cited H.N.M.'s statement that Mary sometimes slept during visitation periods.  Further, if H.N.M. and her half-brother were to prepare meals, they would need someone to "make sure that they turn the stove off and things like that."

(6)     She recommended that Jeff, not Mary, be named managing conservator of H.N.M. and that Mary's visitation with the child should be supervised.

Sarah Martin, an investigator for the Department, received an assignment concerning an altercation between Mary and her father May 7, 2007, while her children were present. This began an investigation of Mary's mental status as well as drug usage. Mary admitted she used methamphetamine, but had been sober for three weeks. A drug test was arranged, but Mary refused to participate and stated that she was "no longer willing to incriminate herself." Mary admitted having overdosed on medication, admitting herself into Texoma Behavioral Center, and being released with a diagnosis of bipolar disorder. Martin testified Mary stated that the stress of the custody battle caused her to attempt to commit suicide.

Mary testified she received treatment at a mental health facility and was diagnosed as bipolar. She testified she had quit taking the medications prescribed to treat her condition because she did not like how the medications made her feel. Mary did testify, though, that she had obtained a different prescription and was currently taking those medications. The Department alleged Mary had failed to adequately follow discharge plans for her mental condition, but there was no evidence of any specific plans or how Mary had failed to comply. She did, though, admit that while she claimed to be taking medications for her bipolar condition, she did not attend counseling because she was "okay."

9

In February 2008, Mary tested positive for methamphetamine use; she denied using drugs and later claimed that her prescription medications caused the positive drug test. In addition to the positive drug test, Mary's brother-in-law, Charles Whitten, testified that at some point in the summer of 2008, he was called to Mary's home in Midlothian to bring her back from a dispute of some kind with her boyfriend. Whitten said that in Mary's bag he found crack pipes and lighters. After bringing Mary to the Whitten home in Paris, Mary got in a fight with her sister and left the house. Mary was taken to jail on criminal trespass charges.

John Watkins, the temporary program director for the Department at the time of their investigation, told the trial court that H.N.M. and her half-brother have a very strong bond, and the trial court should consider emotional and mental damage to the child which would be inflicted on H.N.M. if she were separated from her sibling.

Also, the trial court apparently interviewed H.N.M. privately as authorized by Section 153.009 of the Texas Family Code. No record has been presented of the interview, and no request for one was made. But the trial court included in its findings of fact the following: "[H.N.M.] expressed the desire to remain in the care of Jeff Frey, with whom she feels safe and well cared for. She wants to reside with her sibling, [J.D.F.]. [H.N.M.] also indicated to the Court she was fearful of residing with her mother, Mary Frey."

There was evidence Mary either exposed or left the child in the care of "drunk men." Mary had been diagnosed as bipolar a little more than a year before trial, although according to her she was

10

taking medications to manage that condition. Although Mary mentioned her treatment and diagnosis, she did not detail what led to her treatment in a Denison area hospital, where she received the diagnosis of bipolar disorder. However, Sarah Martin, a Department investigator, testified Mary told her she had attempted suicide because of the stress of the Department action and some criminal investigation. The counselor who had worked extensively with the child testified that the child did not feel safe in Mary's care and that the child said she would feel safe if a Department worker supervised visitations. Those statements by H.N.M. to counselor Rusak were made about one month before trial. We cannot say the trial court abused its discretion in finding that a preponderance of the evidence showed that Mary had "engaged in conduct that endangered the physical and emotional well-being of" the child. Put another way, the evidence is legally and factually sufficient to overcome the parental presumption and support the trial court's decision to name Jeff and Mary as joint managing conservators, rather than Mary as the sole managing conservator.

## VI.    Best Interest of the Child

The trial court made a specific conclusion of law that allowing Jeff to determine H.N.M.'s primary residence would be in the child's best interest. While Section 153.131 instructs on the standard for appointing a nonparent as managing conservator, the trial court's decisions are also governed by Section 153.002, which mandates that "[t]he best interest of the child shall always be the primary consideration . . . in determining the issues of conservatorship and possession of and access to the child." TEX. FAM. CODE ANN. § 153.002 (Vernon 2008). Trial courts have broad

11

discretion to determine what is in a child's best interest; we review a trial court's decision regarding child custody, control, and possession matters for a clear abuse of discretion. *Gillespie*, 644 S.W.2d at 451; *see also In re Marriage of Ellis*, No. 06-08-00012-CV, 2008 Tex. App. LEXIS 6289 (Tex. App.—Texarkana Aug. 19, 2008, no pet.) (mem. op.) (some evidence to support trial court ruling giving mother right to determine primary residence of child; "The trial court's ruling was within the range of reasonable disagreement and was not arbitrary or capricious. As such, the ruling was not an abuse of discretion.").

While Mary goes to great lengths to point out Jeff's shortcomings, the trial court was in the best position to view each witness' demeanor and credibility. There was evidence adduced that Jeff had a history of drug abuse; Jeff admitted that "in my past" he had delivered drugs. However, there was also evidence that H.N.M. considered Jeff to be her father and that he was the only father she had known. Testimony showed that H.N.M. had lived with Jeff at least since May 2007. As mentioned above, the child told Rusak that she did not feel safe with Mary and would have wanted a Department worker to supervise visitations with Mary. The child apparently expressed to the court that she did not feel safe with Mary. She also told at least two witnesses—Rusak and CASA volunteer Sharon Eubanks—that she wanted to stay with Jeff. Rusak testified that on the many occasions when Mary would fail to show up for visitations with H.N.M., the child became angry, stressed, and afraid. Rusak described a pattern where, after a period of no visits from Mary, on

reinstatement of visitations, H.N.M. demonstrated defiance and fighting with her brother at home; then, when Mary did not visit for a period of time, H.N.M.'s behavior improved.

Also, while the trial court made a finding of fact that Mary had completed parenting classes, testimony at trial was that she had only attended one or two classes, apparently in September 2007, and there was testimony that as of April 2008 she had not attended parenting classes.

Jeff attended the parenting classes even though he was not required by the Department to do so. He also went to eight to ten therapy sessions with Rusak, to address both his stress over court proceedings and how to help the two children "heal from their experiences." Martin testified that she made several visits to Jeff's home and that the children seemed well cared for. Martin said H.N.M. calls Jeff "Daddy" and enjoys staying with him. The child's therapist and the Department supervisor, Melinda Johnson, both recommended to the trial court that Jeff be named sole managing conservator and that the child should not be placed with Mary. Johnson specifically stated that placement with Jeff was in the child's best interest. Johnson's recommendation was based on Jeff's history: the child lived with Jeff before the Department's involvement; he had been making sure the child got to school (which she attended regularly and did well in), medical appointments, and counseling for at least a year. Additionally, under direct questioning from the trial court, John Watkins, the temporary program director for the Department at the time of its investigation, told the trial court that H.N.M. and her half-brother have a very strong bond, and the trial court should

consider emotional and mental damage to the child which would be inflicted on H.N.M. if she were separated from her sibling.

Based on the totality of evidence, we cannot say the trial court abused its discretion in determining that it was in the child's best interest to appoint Jeff as a joint managing conservator with the right to determine the child's primary residence.

We affirm the judgment of the trial court.


Jack Carter
Justice

Date Submitted:     September 16, 2009
Date Decided:       October 21, 2009

14