**Opinion issued May 23, 2019**



In The

# Court of Appeals

### For The

# First District of Texas

_____

**NO. 01-17-00643-CV**

_____

**LAMAR CARVER BUNTS, Appellant**

**V.**

**SENSIMONE B. WILLIAMS, Appellee**

**On Appeal from the 247th District Court
Harris County, Texas
Trial Court Case No. 2015-22036**

## MEMORANDUM OPINION

LaMar Carver Bunts ("Father") and Sensimone Williams ("Mother") are the

parents of a daughter ("Beth") born in 2009.[1] In 2015, Mother filed suit against

Father, requesting the trial court to adjudicate the parent-child relationship between

_____

[1]     Beth is a pseudonym. *See* TEX. FAM. CODE § 109.002(d).

Father and Beth and to determine, inter alia, whether Mother was entitled to retroactive child support against Father. Mother also requested that Father be prohibited from taking Beth to Brazil, a country to which Father has ties. Following a bench trial, the trial court signed a judgment adjudicating Father's parentage, awarding Mother retroactive child support, prohibiting Father from taking Beth to Brazil, and addressing other issues related to conservatorship, possession, and support. The trial court filed findings of fact and conclusions of law in support of its judgment.

In four issues, Father challenges the trial court's judgment. He contends that the trial court abused its discretion by awarding Mother $52,508 in retroactive child support and by prohibiting him from taking Beth to Brazil. He also complains that the trial court should have filed additional findings of fact and conclusions of law.

We affirm.

## Background

Mother and Father have never been married to one another nor have they ever lived together. However, Mother and Father have known each other since they were teenagers. They attended the same high school and the same college. They maintained their relationship when each went to different graduate schools and then began their professional careers.

At the time of Beth's birth in September 2009, Mother lived in New Jersey, and Father lived in California. Father was present at Beth's birth, and he was named as her father on her birth certificate. After the birth, Father continued to live in California and would travel to see Beth in New Jersey, staying in Mother's home when he came to visit.

When Beth was six months old, Mother accepted a job in Virginia, and she and Beth moved there. Father continued to travel from California to see Beth, staying in Mother's home when he visited. Father also maintained frequent telephone and video contact with Beth.

Mother was primarily responsible for facilitating decisions relating to Beth's basic needs, such as her education and her medical care. Mother kept Father informed about issues important to Beth's development and well-being, and Father agreed with the decisions and choices Mother made regarding Beth's upbringing. Father would attend medical appointments and school activities with Beth when he could. They would all celebrate important events together, such as birthdays. In short, during this time, Mother and Father amicably co-parented Beth.

As an infant, Beth was in daycare in New Jersey. She was also in daycare in Virginia. In 2012, Mother researched preschools for Beth and found one that she liked, the Congressional School. Mother and Father signed a contract with the

school, indicating that they were each individually liable for Beth's tuition of $20,000 to $22,000 per year.

In 2012, Beth was diagnosed with sensory processing disorder. To treat the disorder, Beth was prescribed occupational therapy. Mother and Father agreed that Beth should have occupational therapy, but Mother paid for the therapy. Beth met her goals for the therapy, and it was discontinued in 2014.

In September 2014, Mother informed Father that he could no longer stay in her home when he came to visit Beth. Mother would later testify that she made this decision after Father stayed out all night while visiting Beth and would not answer Mother's calls. Father continued to visit Beth, but he stayed in a hotel when he came to visit.

Mother learned in 2014 that her employer required her to move to Houston in June 2015. Father was informed of the upcoming move. While still living in Virginia, Mother began to research and visit possible schools for Beth in Houston. Father participated in visiting the schools, and the parents agreed on a school for Beth in Houston. Once in Houston, Beth again needed occupational therapy.

Up to this point, there had never been a court order adjudicating Father's paternity. Nor had there been a court order requiring Father to provide financial support for Beth. However, since Beth's birth, Father had provided periodic financial support for certain of Beth's needs. When Beth was born, Father gave Mother $5,000

4

that he had received from his insurance company. Father also provided secondary health insurance to Beth from 2009 until 2013.

Father on occasion paid for Beth's daycare in New Jersey and in Virginia, but Mother paid for most of the daycare costs. Father also paid school tuition at the Congressional School. Father offered evidence at trial indicating that his tuition payments for several years totaled around $60,000.

In her trial testimony, Mother stated that Father's financial support was discretionary, given only when Father chose to provide it and only for expenses he chose to cover. If Father did not pay for an expense associated with Beth's care, then Mother paid for it. Mother described Father's financial support as sporadic and unreliable. She said that Father never gave her money to cover costs associated with Beth's basic daily living expenses, such as food or shelter.

In April 2015, Mother filed suit against Father in Harris County, Texas. Mother sought an adjudication of Father's parentage and requested orders relating to issues of conservatorship, possession, and child support, including retroactive child support. Father filed suit against Mother in Virginia, seeking joint custody of Beth. Mother and Beth moved to Houston in early June 2015 as planned. Ultimately, it was determined that the Harris County court had jurisdiction over the parents' dispute.

Before trial, the parties engaged in mediation, and temporary orders were signed in February 2016. The orders required Father to pay child support and to reimburse Mother for the cost of Beth's health insurance premiums.

At the beginning of trial, the trial court accepted, among others, the following stipulations of the parties:

- The parents will be Beth's joint managing conservators;

- Mother will have the exclusive right to designate Beth's primary residence and the right to receive child support from Father;

- Father will have standard visitation "with expansions";

- Father's net monthly resources exceed the maximum monthly amount for guideline child support at $8,550; and

- Father should pay Mother prospective monthly child support of $1,710 pursuant to the Texas Family Code guidelines.

Among the disputed issues remaining to be tried were the following:

- Whether retroactive child support should be awarded and, if so, how much.

- Whether passport controls and travel restrictions should be imposed with respect to Beth.

A two-day bench trial was held in July 2016. The trial court heard the testimony of Mother, Father, and Beth's current occupational therapist. Documentary evidence was also offered by both parents.

The trial court signed a final judgment on May 16, 2017, adjudicating Father's parentage of Beth. Among its provisions, the judgment also awarded Mother $52,508.00 in retroactive child support as follows:

> The Court finds that no order adjudicating [Father] or ordering any support for the minor child was in place until February 2016.
>
> The Court finds that the parties agreed and stipulated that throughout the child's life, [Father's] average monthly income exceeded the statutory cap and that the parties agreed that periodic monthly child support going forward would be set at $1,170.00 as set forth herein.
>
> The Court further finds that throughout the child's life, [Father] earned at the statutory cap set forth in the Texas family code prior to the September 1, 2013, amendment and after.
>
> The Court further finds that since February 2016, [Father] has paid periodic child support and reimbursed [Mother] for the cost of covering the child on her health insurance policy.
>
> The Court further finds that [Father] knew he was the father from the date of the child's birth and the Court finds that his obligation had support been ordered would have been $115,590.00 in child support; and, $15,120.00 in reimbursement for the health insurance premium carried by [Mother].
>
> The Court also finds that [Father] did provide actual support in the amount of $78,202.00 since the child's birth.
>
> The Court also finds that in light of [Father's] education, employment history and assets, the payment of retroactive child support will not place an undue hardship on him.
>
> Accordingly, the Court, finds it is in the best interest of the child, THEREFORE IT IS ORDERED that [Father] pay to [Mother] retroactive child support in the amount of Fifty-Two Thousand Five Hundred Eight & No/100 Dollars ($52,508.00), such amount

7

representing the difference between the actual amounts paid and the amount that could have been ordered.

In its separately filed findings of fact and conclusions of law, the trial court supported the award of retroactive child support as follows:

**1.4 <u>Findings Supporting Award of Retroactive Child Support</u>**

Prior to this lawsuit [Father] had not been previously ordered to pay support for the child.

Prior to this lawsuit [Father] had not been party to a suit in which support had been ordered.

**1.5 <u>Findings Supporting Amount of Retroactive Child Support</u>**

[Father] was aware he was the child's father from her birth and never denied that he was.

It was undisputed that [Father] owns property in California, Arizona and Brazil.

[Father] paid the agreed temporary child support amount of $1,710 per month after mediation in January 2016, paid his attorneys and signed a residential lease obligating him to pay $2,300 per month.

[Father] paid reimbursement to [Mother] for health insurance during the temporary orders.

No evidence was offered that [Father] was unable to meet his financial obligations during the temporary orders at any other relevant time.

No evidence was presented that [Father] has established or contributed to any educational fund or trust.

[Mother] has established a college savings fund and trust for the child.

It was undisputed that [Father] earned at the statutory cap pursuant to the guidelines in the Family Code from the time of the child's birth.

8

[Father] is highly educated and admitted that he is confident in his employability.

Prior to the temporary order issued by [the trial court] [Father] did not regularly reimburse [Mother] for health expenses for the child not covered by insurance.

In its judgment, the trial court also enjoined the parents from taking Beth to certain countries, including Brazil, a country to which father has business and personal ties. Regarding the travel injunction, the judgment provides:

[Mother] and [Father] may travel internationally with the child and both [Mother] and [Father] are enjoined and IT IS ORDERED that both [Mother] and [Father] shall not take the child to:

1) Any country which is not a signatory member of The Hague Convention on International Abduction;

2) The following Hague Convention signatory countries who have demonstrated patterns of non-compliance with The Hague Convention in the areas of judicial and law enforcement performance—Brazil;

3) The following Hague Convention signatory countries in which a Hague Convention return order has not been enforced against the fleeing parent: Brazil, Romania and Ukraine.

4) The following Hague Convention signatory countries that have more than 8 return applications pending and have been pending for more than 5 years: Brazil.

Supporting the travel restriction to Brazil, the trial court also made the following findings of fact:

**1.7. <u>Findings Supporting Court's Restriction [of] Child's Travel</u>**

The evidence established that [Father] has a substantial affinity for Brazil.

The evidence established that [Father] has traveled there extensively.

The evidence established that [Father] owns property in Brazil.

The Court believed the testimony that [Father] has a network including business contacts and a longstanding affiliation with a Brazilian music group.

The Court found credible [Mother's] concern that it would be very difficult to get the child back should [Father] overstay a visit to Brazil with the child.

Father now appeals the judgment. Specifically, he challenges the trial court's award of retroactive child support and the imposition of the travel restriction to Brazil. He also asserts that the trial court should have filed supplemental findings of fact and conclusions of law.

**Retroactive Child Support**

In his first two issues, Father contends that the trial court abused its discretion in awarding retroactive child support to Mother, and he asserts that the evidence was not sufficient to support the amount of retroactive child support awarded.

**A.  Standard of Review**

We review a trial court's decision awarding retroactive child support under an abuse of discretion standard. *Young v. Terral*, No. 01-14-00591-CV, 2015 WL 8942625, at *2 (Tex. App.—Houston [1st Dist.] Dec. 8, 2015, no pet.) (mem. op.)

10

(citing *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990)). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or when it acts without reference to any guiding principles. *Worford*, 801 S.W.2d at 109.

When applying an abuse-of-discretion standard, challenges to the legal and factual sufficiency of the evidence are not independent grounds of error but are factors used in assessing whether the trial court abused its discretion. *Ayala v. Ayala*, 387 S.W.3d 721, 726 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *Stamper v. Knox*, 254 S.W.3d 537, 542 (Tex. App.—Houston [1st Dist.] 2008, no pet.). "A trial court does not abuse its discretion when there is some evidence of a substantive and probative character to support the trial court's judgment." *Ayala*, 387 S.W.3d 721 at 726. An abuse of discretion does not occur when the trial court's decision is based on conflicting evidence. *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978).

To determine whether a trial court abused its discretion because the evidence is legally or factually insufficient to support its decision, we consider (1) whether the trial court had sufficient evidence upon which to exercise its discretion and (2) whether it erred in its application of that discretion. *See Bush v. Bush*, 336 S.W.3d 722, 729 (Tex. App.—Houston [1st Dist.] 2010, no pet.); *Moroch v. Collins*, 174 S.W.3d 849, 857 (Tex. App.—Dallas 2005, pet. denied). We conduct the applicable sufficiency review when considering the first prong of the test. *See Bush*, 336 S.W.3d at 729; *Moroch*, 174 S.W.3d at 857. We then determine whether, based on

the evidence, the trial court made a reasonable decision. *See In re S.T.*, 508 S.W.3d 482, 489 (Tex. App.—Fort Worth 2015, no pet.); *Moroch*, 174 S.W.3d at 857.

## B.     Entitlement to Retroactive Child Support

Once parentage is established, "the court may order retroactive child support as provided by Chapter 154." TEX. FAM. CODE § 160.636(g). Family Code Section 154.009(a) provides that "the court may order a parent to pay retroactive child support if the parent: (1) has not previously been ordered to pay support for the child; and (2) was not a party to a suit in which support was ordered." *Id.* § 154.009(a). Here, the trial court found—and it is undisputed—that these two criteria are satisfied.

In his first issue, Father intimates that the trial court abused its discretion in awarding retroactive child support because he provided financial support to Beth in the context of a co-parenting relationship with Mother in which there was an understanding of how they would parent and provide for Beth without the need of a court order. Father points out that Mother never sought court-ordered support before their relationship became acrimonious in 2014. Father cites evidence showing that, until their relationship became problematic, he and Mother had harmoniously co-parented Beth since her birth in 2009. He points to specific evidence of financial support that he provided to Beth without a court order. Father claims that there had been no need for court-ordered child support because he and Mother "successfully worked together to parent and provide support and necessities" for Beth. Based on

12

this evidence, Father appears to make an estoppel-like argument that it was an abuse of discretion for the trial court could to award retroactive child support under the circumstances of his co-parenting relationship with Mother.

We agree with Father that retroactive child support is not mandatory; rather, it is based on factual determinations made by the trial court based on the evidence. *See Garza v. Blanton*, 55 S.W.3d 708, 710 (Tex. App.—Corpus Christi 2001, no pet.). But we disagree that any understanding that the parents had about Father's financial contributions in the context of their co-parenting relationship or Mother's acceptance of support without a court order necessarily precluded the trial court from exercising its discretion to award retroactive child support. *Cf. Office of Attorney Gen. of Tex. v. Scholer*, 403 S.W.3d 859, 863 (Tex. 2013) (holding that equitable estoppel cannot be used as affirmative defense in child-support enforcement actions). Instead, as discussed *infra*, the Family Code guides the trial court's discretion in determining what, if any, retroactive support to order. *See* TEX. FAM. CODE § 154.131.

We overrule Father's first issue.

## C. Amount of Retroactive Support

The trial court's judgment states that the court found it was in Beth's best interest for Father to pay Mother $52,508 in retroactive child support. The judgment reveals that this amount was calculated by taking $115,590—the amount the trial

13

court determined Father would have paid in child support had there been a court order in place—adding $15,120 in health insurance premiums Mother paid for Beth, and then subtracting $78,202, the amount of actual support the trial court found Father had provided. In his second issue, Father asserts that the trial court abused its discretion in calculating "the amount and duration" of the $52,508 retroactive child support award because it is not supported by sufficient evidence.

### *Applicable Legal Principles*

When ordering retroactive child support, the trial court "shall use the child support guidelines provided by Chapter 154, together with any relevant factors." TEX. FAM. CODE 160.636(h). Family Code Section 154.131(a) provides that the child support guidelines are intended to guide the court in determining the amount of retroactive child support, if any, to be ordered. TEX. FAM. CODE § 154.131(a). In determining whether to order retroactive child support, the court must "consider the net resources of the obligor during the relevant time period" and whether:

> (1) the mother of the child had made any previous attempts to notify the obligor of his paternity or probable paternity;
>
> (2) the obligor had knowledge of his paternity or probable paternity;
>
> (3) the order of retroactive child support will impose an undue financial hardship on the obligor or the obligor's family; and
>
> (4) the obligor had provided actual support or other necessaries before the filing of the action.

14

*Id.* § 154.131(b)(1)–(4); *see id.* § 154.123(b)(1)–(17) (listing nonexclusive factors court may consider in applying guidelines). Section 154.131(b) does not bind the trial court to the listed factors in determining retroactive child support but is merely intended to guide the trial court in determining the amount of retroactive child support. *In re J.H.*, 264 S.W.3d 919, 924–25 (Tex. App.—Dallas 2008, no pet.). With these principles in mind, we determine whether the trial court properly exercised its discretion by ordering Father to pay $52,508 in retroactive child support.

### *Father was aware of his paternity*

In her petition, Mother requested retroactive child support "from the birth of the child to the present." The trial court made the undisputed finding that Father "was aware he was the child's father from her birth and never denied that he was." *See* TEX. FAM. CODE § 154.131(b)(2).

### *Father's net resources and the child support guidelines*

The record shows that the trial court considered the child support guidelines and Father's net resources in ordering the retroactive support. *See id.* § 154.131(a)–(b). The trial court found that it "was undisputed that [Father] earned at the statutory cap pursuant to the guidelines in the Family Code from the time of [Beth's] birth." The trial court also found that the parties had stipulated that Father's net monthly resources were set at $8,550 because his income exceeds the maximum monthly

amount for guideline child support. *See id.* § 154.125(a). Based on this amount, under the guidelines, the parties stipulated that Father would pay $1,710 in monthly child support. *See id.* § 154.125(b).

Father challenges the finding in the trial court's judgment that states the amount of court-ordered support he would have paid since Beth's birth was $115,590. Father contends that the evidence does not support this amount. He acknowledges that Mother presented evidence breaking down year-by-year how much support Father would have paid under the statutory guidelines from Beth's birth until February 2016, when Father began paying child support under the temporary orders. Mother's evidence showed that Father would have paid $119,250 in court-ordered child support, not $115,590. In other words, the trial court's finding of $115,590 is $3,660 *less than* what Mother's evidence showed the court-ordered support would have been under the child support guidelines. Thus, the evidence offered by Mother was some evidence of a substantive and probative character to support the trial court's award of retroactive support. *See Ayala*, 387 S.W.3d 721 at 726. And, even assuming $115,590 is inaccurate, the finding benefitted Father because it ultimately reduced the amount of retroactive support the court ordered him to pay. *See In re Sanders*, 159 S.W.3d 797, 802 (Tex. App.—Amarillo 2005, no pet.) (noting that, because monthly amount of support parent would have paid, given

16

evidence and child-support guidelines, was greater than amount of ordered retroactive support, appellate court did not see how father was "harmed" by award).

Father also asserts that no evidence was presented to support the trial court's determination that he must reimburse $15,200 in health insurance premiums to Mother. The evidence showed that Mother has provided health insurance for Beth since her birth and that Mother pays $228 per month for Beth's health insurance. Using this amount, Mother's cost of health insurance premiums for Beth from her birth until the entry of the temporary orders would have been over $17,000. We conclude this is some evidence of a substantive and probative character to support the trial court's award of health insurance premiums. *See Ayala*, 387 S.W.3d 721 at 726; *see also Hontanosas v. Hontanosas*, No. 13-08-00309-CV, 2012 WL 432642, *5 (Tex. App.—Corpus Christi Feb. 9, 2012, no pet.) (mem. op.) (upholding judgment ordering father to reimburse mother for health insurance premiums she paid for child as part of retroactive award).

### *Credit for Father's past financial support*

The trial court's judgment also indicates that the court considered Section 154.131(b)'s fourth factor: whether Father provided financial support to Beth. *See* Tex. FAM. CODE § 154.131(b)(4) (directing courts to consider actual support provided when ordering retroactive support). In the judgment, the trial court found that Father provided $78,202 in actual support to Beth since her birth. The trial court

calculated the $52,508 in retroactive child support by subtracting the actual support ($78,202) it found Father provided from the sum of the amount of the court-ordered child support Father would have paid under the guidelines ($115,590) plus the health insurance premiums Mother paid ($15,120). In other words, this equation: ($115,590 + $15,120) − $78,202 = $52,508.

Father contends that he should have been given credit for more than $78,202 in actual support. He points to his documentary evidence admitted at trial showing that he paid $81,078.43 in actual support. The evidence consists of a detailed itemized summary of Beth's expenses Father paid. The total at the bottom of the summary is $81,078.43. Supporting the items listed in the summary, Father provided his bank statements and credit card records.

Father asserts that the summary lists only expenses that he paid for four years before the suit was filed in April 2015; that is, he claims that he only offered evidence of expenses he paid dating back to April 2011. He asserts that he paid for more than $81,078.43 in expenses because he also paid for some of Beth's expenses before April 2011. He implies that those expenses are not in the list. However, a review of Father's itemized summary and supporting documentation reveals that the $81,078.43 includes expenses predating April 2011. For example, the summary includes (1) $5,546.43 Father paid to Mother for "reimbursement for infant doctor treatment" on March 2, 2010; (2) $1,320.00 Father paid for one month of daycare

on March 8, 2010; and (3) three payments of $1,390 (totaling $4,170) for daycare Father paid in January, February, and March 2011. And there are other pre-April 2011 expenses Father listed as well.

Father also points out that, in addition to the $81,078.43, the evidence showed that he provided "secondary" health insurance for Beth from 2009 until 2013. However, the evidence showed that Mother provided Beth's primary insurance. Father points out that he incurred expense in traveling from his home in California to New Jersey, and then to Virginia, to visit Beth. But Mother testified that Father combined many of these trips with business trips that he had in the area. Father testified that he had spent 565 nights with Beth since her birth and before the suit was filed. However, the evidence showed that, until September 2014, father stayed at Mother's home when visiting Beth, saving the expense of a hotel.

In short, Father complains that the trial court did not give him "full credit" for the $81,078.43 in support reflected in his documentary evidence. When determining retroactive support, trial courts are not bound by the factors listed in Section 154.131(b), *see In re J.H.*, 264 S.W.3d at 924–25, including the factor regarding actual support provided to the child, *see In re A.B.*, 368 S.W.3d 850, 860 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (determining that trial court was not required to credit past support provided when determining retroactive support); *In re Sanders*, 159 S.W.3d at 802 (same). Instead, the courts are directed to "consider"

19

the factors in ordering retroactive support. *See* TEX. FAM. CODE § 154.131(b). Here, the record shows that the trial court not only considered past support provided by Father, it also gave him credit for past financial support.

In its findings of fact supporting the retroactive child support, we note that the trial court also found that Father "did not regularly reimburse [Mother] for health expenses for the child not covered by insurance." Mother testified that she spent $19,439.23 for Beth's medical expenses not covered by insurance. She said that Father had not given her any money for those expenses. She testified that she wanted Father to reimburse her for half of those expenses. In its discretion, the trial court may have factored that into how much credit it gave Father for his past financial support. *Cf. id.* § 154.123(b)(12) (providing that, in determining whether to deviate from child support guidelines, court may consider "payment of uninsured medical expenses").

Also, Mother testified that the support Father provided was sporadic and unreliable. He paid for expenses at his discretion when he felt he could afford it. In contrast, Mother paid for Beth's daily living expenses and never received support from Father for those costs. The evidence showed that, if Father chose not to pay for an expense, then Mother was left to cover it.

In short, the trial court was not required to credit the full amount of past financial support Father claimed to have provided. Rather, the court had discretion

to weigh the evidence and determine what amount, if any, to credit. *See In re A.B.*, 368 S.W.3d at 860.

### *Undue hardship*

Father also claims that the award of retroactive child support "would impose an undue hardship" on him. *See* TEX. FAM. CODE § 154.131(b)(3). He points to evidence showing that, at the time of trial, he was unemployed. Father testified that he had quit his job with an education services company, for which he had been employed for four years, because his employer had requested that he move to Iowa. Father testified that he had moved to Houston and was renting an apartment. Father points out, with respect to prospective child support, he has agreed to pay the maximum guideline child support.

The trial court made findings of fact indicating that it considered whether the retroactive child support would be an undue hardship to Father. Specifically, the trial court made the following undisputed findings of fact:

> [Father] paid the agreed temporary child support amount of $1,710 per month after mediation in January 2016, paid his attorneys and signed a residential lease obligating him to pay $2,300 per month.

> [Father] paid reimbursement to [Mother] for health insurance during the temporary orders.

> No evidence was offered that [Father] was unable to meet his financial obligations during the temporary orders at any other relevant time.

The trial court also found, "It was undisputed that [Father] owns property in California, Arizona and Brazil." Father acknowledged that he owns five rental properties, but he indicated that the properties are not making any money and have negative values.

The court further found that "[Father] is highly educated and [he] admitted that he is confident in his employability." Father testified that he attended Harvard and then Stanford business school. The evidence indicated that Father has a strong employment history, showing that he earned $284,960 in 2014 and $323,264 in 2015. Father testified, "I've got skills and a history and record and experience that people would want. So, I feel confident in my ability."

Regarding the undue hardship consideration, the trial court also made the following conclusion of law: "It is not an abuse of discretion to deny a request for relief under the 'hardship' rubric without the obligor's presenting specific evidence at the hearing of his inability to provide for his or his family's 'needs' as a result of the retroactive support." *See In re A.B.*, 368 S.W.3d 856–57. Here, Father testified that it was "very hard" to agree to maximum guideline child support when he did not have a job, but he did not specifically testify how paying retroactive child support would be a hardship for him. And, given his employment history and education, even Father was confident of his employability. Thus, the evidence was sufficient for the

trial court to have determined that retroactive child support would not be an undue hardship on Father.

### *Retroactive support awarded less than amount due for preceding four years*

Section 154.131(c) provides that

> it is presumed that a court order limiting the amount of retroactive child support to an amount that does not exceed the total amount of child support that would have been due for the four years preceding the date the petition seeking support was filed is reasonable and in the best interest of the child.

TEX. FAM. CODE § 154.131(c).

Father acknowledges that the amount of support he would have paid under the guidelines for the four years preceding the filing of Mother's petition was $76,200. The amount of retroactive child support awarded by the trial court was $52,508, which is $23,692 less than what Father would have paid under the guidelines. Mother contends that, under Section 154.131(c), it is presumed that the trial court's judgment—limiting the amount of retroactive support to less than what Father would have paid for the four years preceding the filing of the suit—was reasonable and in Beth's best interest. *See id.*

Father disagrees. He asserts that the "duration" of the retroactive child support award exceeds what is permitted by Section 154.131(c). He contends that, in calculating the amount of retroactive child support, the trial court should have considered only what Father would have paid in support under the guidelines for the

23

four years preceding the filing of Mother's petition less the amount of support he provided. He asserts that, under this calculation, he would not owe any retroactive child support because his evidence showed that he provided $81,078.43 in actual support in the four years preceding the filing of the suit.[2] However, as discussed, a review of Father's evidence shows that some of the expenses comprising the $81,078.43 were expenses paid by Father *before* the four-year period preceding the filing of the suit. Even presuming that the support he provided exceeds the $76,200 in support Father would have paid, Father does not recognize that the trial court was not required to credit him with the amount of support he provided in exercising its discretion to award retroactive support. *See In re A.B.*, 368 S.W.3d at 860; *In re Sanders*, 159 S.W.3d at 802.

---

[2] The Section 154.131(c) presumption can be rebutted by evidence showing that the obligor knew or should have known that he was the father of the child for whom support is sought, and the obligor sought to avoid the establishment of a support obligation to the child. *Id.* § 154.131(d). Father contends that the rebuttal does not apply because he acknowledged that he was Beth's father since her birth, and he never sought to avoid the establishment of a support obligation. In other words, he argues that the trial court was limited to considering only what he would have paid for the relevant four-year period because the rebuttal provision does not apply. However, Father misinterprets the rebuttal provision. The provision has been applied in contexts in which the obligee parent has been awarded an amount of retroactive child support greater than what the obligor parent would have paid during the relevant four-year period. *See, e.g. In re A.B.*, 368 S.W.3d 850, 860 (Tex. App.—Houston [14th Dist.] 2012, no pet.). That is not what happened here. Mother was awarded less than the amount that Father would have paid during the four-year period. That is the reason the rebuttal provision is not applicable here.

Courts are required to interpret a statute by applying the plain meaning of the words used in the statute. *See Lippincott v. Whisenhunt*, 462 S.W.3d 507, 509 (Tex. 2015). Here, the plain language of Section 154.131(c) states that "a court order limiting *the amount* of retroactive child support to *an amount* that does not exceed the *total amount* of child support that *would have been due* for the four years preceding the date the petition seeking support was filed" is presumed to be "reasonable and in the best interest of the child." TEX. FAM. CODE § 154.131(c) (emphasis added). The focus of the statute is on the amount of the retroactive award as compared to the amount that the obligor parent would have been ordered to pay under the guidelines had there been an order. Because the amount of the retroactive child support awarded by the trial court was limited to an amount that did not exceed the amount that Father would have paid in the four years preceding the suit, Father has not shown that the trial court did not adhere to the intent of Section 154.131(c) in ordering retroactive child support.

We conclude that Father has not shown that the trial court acted in an arbitrary or unreasonable manner or without reference to any guiding principles in determining whether to award retroactive child support and in determining the amount of the award. Here, the record shows that the trial court considered the Section 154.131 factors, and there was sufficient evidence to support the trial court's

25

determinations under those factors. Accordingly, we hold that the trial court did not abuse its discretion in ordering Father to pay retroactive child support of $52,508.

We overrule Father's second issue.

## Additional Findings of Fact

In his third issue, Father complains that the trial court did not issue additional findings of fact. Although Father's request for additional findings of fact is not contained in the record, it is undisputed that the request was filed in the trial court.

Texas Rule of Procedure 298 states, "The court shall file any additional or amended findings and conclusions that are appropriate." TEX. R. CIV. P. 298. "Additional findings are not required if the original findings of fact and conclusions of law 'properly and succinctly relate the ultimate findings of fact and law necessary to apprise [the party] of adequate information for the preparation of his or her appeal.'" *In re R.D.Y.*, 51 S.W.3d 314, 322 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (quoting *In re Marriage of Morris*, 12 S.W.3d 877, 886 (Tex. App.—Texarkana 2000, no pet.)).

On appeal, Father asserts,

> While the trial court's original findings offered generalized statements reflecting the factual basis of its decision to award retroactive child support, findings which [Father] challenges here on appeal, the trial court offered no findings demonstrating how the trial court reached its decision, further demonstrating [Father's] claim that the decision is arbitrary and fails to abide by any guiding rules or principles.

Father complains that the trial court did not make "additional findings which establish how the trial court arrived at its final calculations." However, the determinations made by a trial court under Section 154.131's guidelines, evaluating whether a parent should pay retroactive child support, are evidentiary determinations. *See J.A. v. Blount*, No. 01-03-00679-CV, 2004 WL 1472166, at *2 (Tex. App.—Houston [1st Dist.] July 1, 2004, no pet.) (mem. op.). A trial court is not required to make additional findings that relate merely to evidentiary matters or that are aimed at tying down the court's reasoning rather than its conclusions. *See In re S.E.K.*, 294 S.W.3d 926, 930 (Tex. App.—Dallas 2009, pet. denied); *see also Rafferty v. Finstad*, 903 S.W.2d 374, 376 (Tex. App.—Houston [1st Dist.] 1995, writ denied) (holding only necessary finding was ultimate issue—whether division of marital estate was just and right—rather than evidentiary findings as to parties' relative earning capacities, investments of separate property in community residence, or cruelty). Thus, the trial court was not required to specify its evidentiary determinations or detail its reasoning for making the award.

In addition, the failure to make additional findings does not require a reversal if the record indicates Father did not suffer injury. *See In re R.D.Y.*, 51 S.W.3d at 322. Father must show the trial court's refusal to file the requested additional findings caused the rendition of an improper judgment. *See id.* If the refusal to file additional findings did not prevent Father from adequately presenting his argument

27

on appeal, there is no reversible error. *See id.* Generally, an appellant is harmed if, under the circumstances of the case, he must guess at the reason the trial court ruled against him. *See Larry F. Smith, Inc. v. The Weber Co*., 110 S.W.3d 611, 614 (Tex. App.—Dallas 2003, pet. denied).

Here, Father was able to adequately brief his arguments to this Court. The trial court's findings in its judgment and in its separately filed findings of fact show that the trial considered the Section 154.131 guidelines. And the trial court made findings relevant to the guidelines. The trial court's judgment also sets out the precise monetary figures used to calculate the amount of retroactive child support ordered. Father did not have to guess at the basis underlying the award. Thus, Father has not established that the trial court's refusal to make additional findings prevented him from adequately presenting his case on appeal. *See In re R.D.Y.*, 51 S.W.3d at 322.

Father's third issue is overruled.

## Brazil Travel Restriction

In his fourth issue, Father challenges the trial court's travel restriction, enjoining him from taking Beth to Brazil. He contends that the evidence was not sufficient to support the restriction.

### A.    Standard of Review

We review the trial court's determination regarding the travel restriction for abuse of discretion. *See Elshafie v. Elshafie*, No. 13-10-00393-CV, 2011 WL

5843674, at *5 (Tex. App.—Corpus Christi Nov. 22, 2011, no pet.) (mem. op.); *Boyo v. Boyo*, 196 S.W.3d 409, 424 (Tex. App.—Beaumont 2006, no pet.). As stated, an abuse of discretion occurs when a court acts without reference to any guiding rules and principles or in an arbitrary and unreasonable manner. *Worford*, 801 S.W.2d at 109.

## B.     Analysis

Family Code Section 153.501(a) provides,

> In a suit, if credible evidence is presented to the court indicating a potential risk of the international abduction of a child by a parent of the child, the court, on its own motion or at the request of a party to the suit, shall determine under this section whether it is necessary for the court to take one or more of the measures described by Section 153.503 to protect the child from the risk of abduction by the parent.

TEX. FAM. CODE § 153.501(a). One of the measures listed in Section 153.503 permits a trial court to deny a child the ability to travel abroad. *See id.* § 153.503(4).

Identifying "credible evidence" indicating a "potential risk" of international abduction, the trial court made the following findings of fact:

> The evidence established that [Father] has a substantial affinity for Brazil.

> The evidence established that [Father] has traveled there extensively.

> The evidence established that [Father] owns property in Brazil.

> The Court believed the testimony that [Father] has a network including business contacts and a longstanding affiliation with a Brazilian music group.

The Court found credible [Mother's] concern that it would be very difficult to get the child back should [Father] overstay a visit to Brazil with the child.

At trial, the trial court heard evidence regarding Father's ties with Brazil. Mother testified that Father "has a lot of connections in Brazil. He is quite active with a Brazilian musical group. . . . So, typically he would travel to Brazil and then sometimes he'd stay for a month." The evidence also showed that Father owns a home in Brazil.

When asked why she was concerned about Father taking Beth to Brazil, Mother responded, "Because [Father] has a home there. He also has an established life there[.]" Mother also testified that she is concerned that, if Father overstays his visit or decides to stay with Beth in Brazil, "it would be very difficult for me to get her back."

Father testified that he has no intention "to abscond with [Beth] to Brazil" and stated that he has never threatened to do so. However, Father's testimony also confirmed his strong ties with Brazil. He testified that he wants to take Beth to visit Brazil because "it's a big part of [his] life" and has been a big part of his life for "two decades." Father testified that he speaks Portuguese, has taught Beth Portuguese words, and "always expected that [Beth] would learn Portuguese." Thus, evidence was presented supporting the trial court's findings.

When the record supports a determination that "credible evidence" indicates a "potential risk" of international abduction, the trial court must then "determine under [Section 153.501(b)] whether it is necessary for the court to take one or more of the measures described by Section 153.503 to protect the child from the risk of abduction by the parent." *Id.* § 153.501(a).

Section 153.501(b) provides,

In determining whether to take any of the measures described by Section 153.503, the court shall consider:

(1) the public policies of this state described by Section 153.001(a)[3] and the consideration of the best interest of the child under Section 153.002[4];

(2) the risk of international abduction of the child by a parent of the child based on the court's evaluation of the risk factors described by Section 153.502;

(3) any obstacles to locating, recovering, and returning the child if the child is abducted to a foreign country; and

(4) the potential physical or psychological harm to the child if the child is abducted to a foreign country.

*Id.* § 153.501(b).

---

[3]   Section 153.001(a) states that it is the public policy of the state to assure that children have frequent contact with parents who act in the best interest of the child; to provide a safe, stable, and nonviolent environment for the child; and to encourage parents to share in the rights and duties of raising their child after separation or divorce. *See* TEX. FAM. CODE § 153.001(a).

[4]   Section 153.002 provides that the best interest of the child shall always be the primary consideration in determining issues of conservatorship, possession, and access. *See id.* § 153.002.

Here, the record shows that the trial court focused on the third factor: "any obstacles to locating, recovering, and returning the child if the child is abducted to [Brazil]." *See id.* 153.501(b)(3). In issuing the travel restriction, the trial court recognized in its judgment that Brazil is a signatory to the Hague Convention that has "demonstrated patterns of non-compliance with The Hague Convention in the areas of judicial and law enforcement performance." The court also recognized that Brazil is a Hague Convention signatory country in which "a Hague Convention return order has not been enforced against the fleeing parent" and that Brazil has "more than 8 return applications pending and [that have] been pending for more than 5 years."

Father asserts that there was "no evidence to support the finding that Brazil has a history of not enforcing child custody orders or delayed applications in returning a child." However, the trial court's findings are legislative facts of which the trial court could take judicial notice sua sponte. *See In re Sigmar*, 270 S.W.3d 289, 301–02 (Tex. App.—Waco 2008, orig. proceeding). "Legislative facts . . . are not normally the objects of evidentiary proof. As to them, judicial notice instead of record evidence is the rule rather than the exception, and indisputability is not required to justify judicial notice." *In re Graves*, 217 S.W.3d 744, 750 (Tex. App.—Waco 2007, orig. proceeding) (quoting 1 Steve Goode et al, TEXAS PRACTICE SERIES: GUIDE TO THE TEXAS RULES OF EVIDENCE § 201.2 (3d ed. 2002)). "Evidence

32

regarding the legal practices and procedures of a foreign country are legislative facts" subject to judicial notice. *In re Sigmar*, 270 S.W.3d at 302 (citing *Rodriquez v. State*, 90 S.W.3d 340, 360 (Tex. App.—El Paso 2001, pet. ref'd)).

Although the rules of evidence provide a method for parties to request a court to take judicial notice of laws of a foreign country, *see* TEX. R. EVID. 203, "facts regarding another country's compliance with the Hague Convention on the Civil Aspects of International Child Abduction . . . are legislative facts about which a trial or appellate court may take judicial notice without prompting by the parties," *In re Sigmar*, 270 S.W.3d at 302; *Chen v. Hernandez*, No. 03-11-00222-CV, 2012 WL 3793294, at *13 (Tex. App.—Austin Aug. 28, 2012, pet. denied) (mem. op.) (agreeing that compliance with Hague Convention is legislative fact that can be judicially noticed)). Thus, the trial court was permitted to take judicial notice of Brazil's noncompliance with the Hague Convention. *See In re Sigmar*, 270 S.W.3d at 301–02; *see also Dutton v. Dutton*, 18 S.W.3d 849, 856 (Tex. App.—Eastland 2000, pet. denied) ("This court may take judicial notice, even if no one requested the trial court to do so and even if the trial court did not announce that it would do so."); *Trujillo v. State*, 809 S.W.2d 593, 595–96 (Tex. App.—San Antonio 1991, no pet.) (stating that trial court "could have easily rejected any inadmissible testimony by the school teacher and taken judicial notice that Edgewood High School is an accredited school by the state education agency").

"The website for the State Department provides helpful resources regarding international travel and the pertinent practices and procedures of other nations." *In re Sigmar*, 270 S.W.3d at 303. The State Department's report on international child abduction identifies Brazil as a non-compliant signatory to the Hague Convention on the Civil Aspects of International Child Abduction and provides details of its noncompliance. U.S. DEP'T OF STATE, ANN. REP. ON INT'L CHILD ABDUCTION at 11 (2017).[5]

> For instance, the report states,

> In 2016, Brazil demonstrated a pattern of noncompliance. Specifically, the judicial authorities in Brazil persistently failed to regularly implement and comply with the provisions of the Convention. As a result of this failure, 68 percent of requests for the return of abducted children under the Convention have remained unresolved for more than 12 months. On average these cases have been unresolved for 49 months. Brazil has been cited as non-compliant since 2005.

*Id.* The State Department's information supports the trial court's findings concerning obstacles to locating, recovering, and returning Beth if she is abducted to Brazil, *see* TEX. FAM. CODE § 153.501(b), which in turn support the imposition of the travel restriction under Section 153.503, *see id.* § 153.503(4).

Father has not shown that the trial court acted without reference to any guiding rules and principles or in an arbitrary and unreasonable manner by enjoining Father

---

[5]     https://travel.state.gov/content/dam/NEWIPCAAssets/pdfs/2017%20ICAPRA%20Report%20-%20Final%20(1).pdf (last visited May 15, 2019).

from taking Beth to Brazil. Accordingly, we hold that the trial court did not abuse its discretion in ordering the travel restriction.

We overrule Father's fourth issue.

## Conclusion

We affirm the judgment of the trial court.


Laura Carter Higley
Justice

Panel consists of Justices Keyes, Higley, and Landau.