

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-18-00047-CV

_____

IN THE MATTER OF THE MARRIAGE OF
HOLLY LYNN MITCHELL AND JEREMY GUY MITCHELL AND
IN THE INTEREST OF C.P.M., A CHILD

On Appeal from the 276th District Court
Morris County, Texas
Trial Court No. 26077

Before Morriss, C.J., Burgess and Stevens, JJ.
Opinion by Justice Stevens

O P I N I O N

Holly Lynn Mitchell petitioned for divorce from her husband, Jeremy Guy Mitchell, and asked the trial court to appoint them both as joint managing conservators of her three children, Amber, Heather, and Claire.[1] Jeremy filed a cross-petition for divorce and requested that he be appointed sole managing conservator of their children "due to [Holly's] addiction to prescriptive medications" and alleged history of child neglect. Don Butler intervened to adjudicate his parentage of and conservatorship to the youngest child, Claire, who was born in March 2014. After adjudicating Butler as Claire's father, the trial court appointed Butler, Holly, and Jeremy as joint managing conservators of Claire, and designated Jeremy as the "non-parent joint managing conservator" with the exclusive right to establish Claire's primary residence. The trial court also ordered Butler to pay child support to Jeremy.

On appeal, Butler argues that the trial court erred in appointing a nonparent as managing conservator because the record contains insufficient evidence that Butler's appointment would significantly impair Claire's physical health or emotional development. On the condition that his first argument is correct, Butler argues that the trial court erred in requiring him to pay child support to Jeremy.

We find that Jeremy presented legally and factually sufficient evidence to show that, absent Jeremy's appointment, appointment of only the child's biological parents would significantly impair Claire's emotional development. We also find that the trial court did not abuse its discretion

---

[1]We use pseudonyms to protect the identity of the children as much as is possible given the style of this case. *See* TEX. R. APP. P. 9.8; TEX. FAM. CODE ANN. § 109.002(d) (Supp.).

2

in appointing Jeremy joint managing conservator.  Because of these findings, we overrule Butler's conditional argument and affirm the trial court's judgment.

## I.      Factual Background

At trial, Jeremy testified that he lived with Holly, Amber, Heather, and Claire until Holly left him in March or April 2017.  Jeremy viewed himself as Claire's father and testified that Claire, who was four at the time of trial, had lived with him for all of her life, except for a four-month period when Claire lived with Holly after the separation.  During that period, Holly was arrested in Claire's presence for possession of a controlled substance.  Jeremy said that Holly abused prescription medication, had burned Claire on the hand with a cigarette, and was not mentally capable of caring for the girls.  He testified that Holly had "court cases pending for drugs that she's been selling or that she's had found in her car" and had another pending charge for unlawful possession of a firearm she carried in her purse.  Holly admitted she had hydrocodone and a weapon in her purse when arrested and testified that two of four criminal charges were still pending at the time of trial.

Jeremy described his home and testified that it was in Claire's best interest to keep living with him, Amber, and Heather.  He added that his parents, whom Claire had believed were her grandparents since birth, also lived with him and helped care for Claire.  Jeremy's mother, Gina Cobb, mirrored Jeremy's testimony about Claire's best interest and added that Claire called Jeremy her father and called Butler by name.  Cobb also testified that she owned the daycare that Claire attended and that she was happy there.  According to Cobb, Claire acted as if she did not want to leave to see Butler.

3

Despite Cobb's testimony, Jeremy agreed that Claire was bonded with Butler and that he did not know of anything Butler had done that would endanger her physically or emotionally. Even so, Holly testified that it was in Claire's best interest for Jeremy, not Butler, to be the joint managing conservator with the exclusive right to determine the child's primary residence. Holly testified that Jeremy has been Claire's father figure since birth even though he knew he was not the child's biological father. Butler also testified that he spoke with Jeremy a month after Claire was born and that Jeremy knew the child was not his at the time. Holly believed that it was not in Claire's best interest to separate with the family she had known since birth and that it would negatively impact the child if she had to live with Butler 200 miles away.

Holly's testimony about her relationship with Butler helped clarify her best interest opinion. The evidence showed that Butler was still married to his wife of fourteen years, Cindy. According to Holly, she and Butler had a sexual relationship for years while they were both married, the relationship was still ongoing, and they had sex a few days before the trial. Holly said Butler had photos and video recordings of their sexual activities and her sexual activities with other men. Holly testified that Butler kept telling her that he would divorce Cindy and marry her. Holly's father, Jimmy Waits, said Butler told him he would divorce Cindy to be with Holly. According to Holly, Butler purchased an engagement ring for her and said he "would take [Claire] and get custody and hand her back to [Holly] because he was filing for divorce as soon as [the case was] over." Telephone conversations admitted into evidence supported Holly's testimony. Holly testified that Butler did not have a stable home life.

4

Holly also testified that Butler was physically abusive toward her two times. One assault occurred in the summer of 2017 while the case was pending. According to Holly, Butler hit her in the face with a closed first. Photos of Holly after the assault were admitted into evidence. Holly claimed that she did not report the abuse to the police because she was scared that Butler would kill her. Holly admitted that her relationship with Butler affected her parenting. Even so, she testified that Butler had impregnated her again in 2017, but that she miscarried and had never told him about the pregnancy.

Butler had an eighty-percent disability rating because of post-traumatic stress disorder (PTSD) and a concussion as a result of his time in the military. He believed himself cured and had not seen a doctor in three years. Several witnesses testified that Butler consumed alcohol, but Butler and Cindy claimed it was never to excess even though Holly had described him as drunk in a text message. Waits testified that Butler brought a 9mm weapon and a cooler full of hard liquor to his home during the last Easter celebration and opined that "anybody that walks in your home and is drinking as much hard liquor as [Butler] was" would have parenting issues. According to Waits, Holly said Butler knew that Claire was his child from conception but did not "man up." Waits noted that Butler and Holly text and talk constantly and that the calls interfered with her visitation with her children. Waits agreed that it was in Claire's best interests to live with Jeremy, not Butler, and that Jeremy should have the exclusive right to determine the child's primary residence.

Butler testified that he worked in a supervisory position for BNSF Railroad, had been married to Cindy, a dispatcher for the Gatesville City Police Department, for fourteen years, and

5

had two daughters from the marriage. According to Butler, he and Cindy did not have an open marriage, and he only slept with Holly and sent naked photos of himself to her during a period of separation and pending divorce from Cindy after a derogatory photo of Cindy having sex with other men appeared on the internet. After he reconciled with Cindy, Butler claimed he had not had sex with anyone else.

Butler and Cindy testified that Holly told Butler that Claire was his child when she was pregnant. Butler paid her $1,000.00, but said he "second guess[ed]" Holly because he knew she was married to Jeremy. Butler claimed that Holly denied his offer to pay Claire's medical expenses because the child was on Medicaid, but said he refused Holly's other requests for money for Claire's care because Holly would not relent to his requests for a DNA test and would not let him see the child. Butler said Jeremy should have known by December 2014 that Claire was not his child. Butler testified that he had previously tried to file papers to establish the child's parentage, but claimed the paperwork went missing from the clerk's office.

When asked about his ongoing relationship with Holly, Butler classified it as purely platonic. When confronted with text messages and telephone records refuting the claim, Butler said he only told Holly he would marry her so he could be with Claire because Holly would restrict his access to the child if he did not pretend they were in a relationship. Butler claimed that he kept leading Holly on because she was mentally unstable and had threatened suicide. That said, Butler's father testified that Butler admitted to an ongoing sexual relationship with Holly and said Cindy was okay with their relationship even though she knew Butler and Holly had sex three days before trial.

6

Cindy admitted that she knew Butler and Holly had some sort of relationship because Holly was the mother of Butler's child. But she denied knowledge of their sexual relationship after the reconciliation. Cindy testified that she did not have an open marriage and that it would hurt her if Butler and Holly were having sex and if he had purchased an engagement ring for Holly. Even so, she did not currently consider her marriage at risk.

Although Butler first stated that he did not have concerns about Holly's ability to parent, he later claimed that both Holly and Jeremy were addicted to prescription medication. Though Holly was a computer tomography technologist at Good Shepherd Medical Center and had a four-bedroom home, Butler claimed she had no income and would not be a suitable parent. Butler also testified that he did not think Jeremy's home was suitable because "the living arrangements [were] a little tight." As a result, he wished for Claire to move to Gatesville to live with him.

Butler testified that, even though the trial court's temporary orders did not provide for his possession of the child, Claire had spent nine months with him and visited his house several times. Cindy testified that she was willing to be responsible for Claire and had even watched her alone two or three times when Butler was unable to visit with the child. Butler and Cindy testified that their fourteen-year-old and eight-year-old daughters loved Claire, that Claire was happy when she was around them, and that it was important for Claire to have a relationship with them.

Cindy admitted that Child Protective Services had found out that she and Butler had left their children home alone when the oldest child was eight or nine years old. But the remaining evidence from Butler, his father, and Cindy established that Butler was a good father to his other daughters, who made straight As and were active in extracurricular activities and church. While

Butler agreed that it was important for Claire to maintain a relationship with Amber, Heather, and Jeremy, he did not believe they needed to be together. Instead, he believed that Claire should live with him, Holly should exercise supervised visitation, and Jeremy should also have some nonparent visitation rights.[2] Butler planned for Claire to attend the daycare at Gatesville Memorial Church, where Cindy's mother served as the director of the children's program. Cindy testified that Amber and Heather were welcome in her home anytime.

Jessica Attaway, an employee of the Department of Family and Protective Services, testified that she had no concerns with Claire being placed with either Jeremy or Butler, but added that it was in Claire's best interest to remain in Morris County. Jeremy, Butler, and Butler's father testified that Butler had not done anything to cause Claire physical or emotional harm.

The amicus attorney appointed for the children, who was the first witness at trial, said he wanted to see Claire "maintain the close relationship that she has with Jeremy" and determined it was not in the child's best interest to be separated from Amber and Heather. The amicus attorney said that a move to Butler's home would change her lifelong relationships and that he was "not completely sure that [that] move" was in the child's best interests. He did not believe that Jeremy rebutted the parental presumption, but admitted that he did not investigate Butler's sex life and based his opinion on the strength of Butler and Cindy as an "upstanding" couple. In a letter written after the trial, the court expressed its concern that the amicus attorney did not have the benefit of evidence establishing that Butler and Holly had an ongoing sexual relationship and that Butler planned to divorce Cindy and leave Holly after obtaining primary custody of Claire.

---

[2]Butler also testified that he made $119,000.00 per year and would pay child support if necessary.

**II.    The Trial Court Did Not Err in Appointing Jeremy the Joint Managing Conservator with the Right to Designate Claire's Primary Residence**

**A.    Standing**

"Standing is implicit in the concept of subject-matter jurisdiction, which is never presumed and cannot be waived." *In re D.W.G.K.*, 558 S.W.3d 671, 677–78 (Tex. App.—Texarkana 2018, pet. denied) (citing *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 444–45 (Tex. 1993)).  Because standing is a threshold issue, it "may be raised for the first time on appeal." *In re M.T.C.*, 299 S.W.3d 474, 479 (Tex. App.—Texarkana 2009, no pet.) (citing *Tex. Ass'n of Bus.*, 852 S.W.2d at 445–46).

Butler questions Jeremy's standing under Section 102.004 of the Texas Family Code, which states:

> **Standing for Grandparent or Other Person**
>
> . . . .
>
> (b)    An original suit requesting possessory conservatorship may not be filed by a grandparent or other person.  However, the court may grant a grandparent or other person . . . deemed by the court to have had substantial past contact with the child leave to intervene in a pending suit filed by a person authorized to do so under this chapter if there is satisfactory proof to the court that appointment of a parent as a sole managing conservator or both parents as joint managing conservators would significantly impair the child's physical health or emotional development.

TEX. FAM. CODE ANN. § 102.004 (Supp.).  Butler argues that a "nonparent establishes standing . . . only in 'extreme circumstances'" and suggests that Jeremy failed to do so.  Because Jeremy did not have to establish standing as a nonparent, we reject this argument.

9

Jeremy was Claire's presumptive father because she was born while Holly and Jeremy were married, and his name appeared on the child's birth certificate. *See* TEX. FAM. CODE ANN. § 160.204(a)(1) (Supp.). Jeremy's petition also alleged that he was Claire's father. As a result, Jeremy was considered a parent under the Texas Family Code, had general standing to file an original suit affecting the parent-child relationship (SAPCR), and did not have to establish nonparent standing. *See* TEX. FAM. CODE ANN. §§ 101.024, 102.003(a)(8) (Supp.).[3] Jeremy's standing under Section 102.003(a)(8) was not erased by the trial court's final order adjudicating parentage in Butler's favor. Because we find that Jeremy had standing to maintain the SAPCR, we now address the merits of the case.

B.      **Standard of Review**

"A trial court's order regarding conservatorship is reviewed under an abuse of discretion standard." *In re J.Y.*, 528 S.W.3d 679, 686 (Tex. App.—Texarkana 2017, no pet.) (citing *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007)). "A trial court abuses its discretion if it acts arbitrarily and unreasonably or without reference to any guiding principles." *Id.* (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985)). "We, therefore, will not reverse a trial court's appointment of a non-parent as . . . managing conservator unless we determine that the appointment was arbitrary and unreasonable." *Id.* (citing *J.A.J.*, 243 S.W.3d at 616; *Earvin v. Dep't of Family & Protective Servs.*, 229 S.W.3d 345, 350 (Tex. App.—Houston [1st Dist.] 2007, no pet.)). "We view the evidence in the light most favorable to the trial court's

---

[3]Under Section 101.024, the term "'[p]arent' means . . . a man presumed to be the father, a man legally determined to be the father, a man who has been adjudicated to be the father by a court of competent jurisdiction, a man who has acknowledged his paternity under applicable law, or an adoptive . . . father." TEX. FAM. CODE ANN. § 101.024.

decision and indulge every legal presumption in favor of its judgment." *Id.* (quoting *Earvin*, 229 S.W.3d at 350).

"Legal and factual sufficiency are not independent grounds of error in conservatorship cases but are merely relevant factors in deciding whether the trial court abused its discretion." *Id.* (citing *In re W.M.*, 172 S.W.3d 718, 725 (Tex. App.—Fort Worth 2005, no pet.)). "In applying the abuse of discretion standard, we initially determine whether the trial court had sufficient evidence upon which to exercise its discretion." *Id.* "If so, we then determine whether the trial court erred in its exercise of that discretion." *Id.*

"In determining legal sufficiency, the appellate court determines 'whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review.'" *Petrohawk Props., L.P. v. Jones*, 455 S.W.3d 753, 770 (Tex. App.—Texarkana 2015, pet. dism'd) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Basley v. Adoni Holdings, LLC*, 373 S.W.3d 577, 582 (Tex. App.—Texarkana 2012, no pet.)). "In looking at the evidence, we credit favorable evidence if a reasonable [fact-finder] could and disregard contrary evidence unless a reasonable [fact-finder] could not." *Id.* (citing *City of Keller*, 168 S.W.3d at 827).

> The evidence is legally insufficient if (1) there is a complete absence of evidence of a vital fact; (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact; (3) there is no more than a mere scintilla of evidence offered to prove a vital fact; or (4) the opposite of the vital fact is conclusively established by the evidence.

*Id.* (citing *Jelinek v. Casas*, 328 S.W.3d 526, 532 (Tex. 2010)). "More than a scintilla of evidence exists when the evidence reaches a level enabling reasonable and fair-minded people to differ in their conclusions." *Id.* (citing *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.

11

1997)). "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

"When we review a finding for factual sufficiency, we consider all of the evidence and will set aside a finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Edwards v. Mid-Continent Office Distribs., L.P.*, 252 S.W.3d 833, 836 (Tex. App.—Dallas 2008, pet. denied) (citing *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam)).

When, as here, no findings of fact and conclusions of law were requested or filed, it is implied that the trial court made all findings necessary to support its judgment. *In re Crumbley*, 404 S.W.3d 156, 162 (Tex. App.—Texarkana 2013, no pet.) (citing *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam)).

## C.    Relevant Statutes and Caselaw

"The primary consideration in determining conservatorship is always the best interest of the child." *J.Y.*, 528 S.W.3d at 686 (citing TEX. FAM. CODE ANN. § 153.002). "Because the trial court is in a position to analyze the facts, with regard to issues of conservatorship, control, possession, child support, and visitation, the trial court is given 'wide latitude in determining the best interests of a minor child.'" *In re M.T.C.*, 299 S.W.3d 474, 479 (Tex. App.—Texarkana 2009, no pet.) (quoting *Stallworth v. Stallworth*, 201 S.W.3d 338, 347 (Tex. App.—Dallas 2006, no pet.)). Yet, "[b]ecause a trial court has no discretion in determining what the law is or applying

the law to the facts . . . discretion is abused when a court grants conservatorship or access to a [non]parent who fails to meet the statutory requirements" of the Texas Family Code. *Id.*

"The presumption that the best interest of the child is served by awarding custody to the parent is deeply embedded in Texas law." *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000) (citing *Lewelling v. Lewelling*, 796 S.W.2d 164, 166 (Tex. 1990)). "The parental presumption is based upon the natural affection usually flowing between parent and child." *Id.* (citing *Taylor v. Meek*, 276 S.W.2d 787, 790 (1955)). The Texas Legislature codified the parental presumption in Chapter 153 of the Texas Family Code. *Id.* Section 153.131 states:

> [U]nless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child.

TEX. FAM. CODE ANN. § 153.131(a). "Thus, under Chapter 153, the nonparent [must] rebut the parental presumption by showing that the appointment of the parent would significantly impair the child's health or development." *V.L.K.*, 24 S.W.3d at 341–42 (citing *Brook v. Brook*, 881 S.W.2d 297, 298 (Tex. 1994)). This required finding under Section 153.131 "is governed by a preponderance-of-the-evidence standard." *J.A.J.*, 243 S.W.3d at 616; *J.Y.*, 528 S.W.3d at 687.

There must be evidence of "specific actions or omissions of the parent that demonstrate an award of custody to the parent would result in physical or emotional harm to the child." *J.Y.*, 528 S.W.3d at 687 (citing *Lewelling*, 796 S.W.2d at 167), *In re T.R.B.*, 350 S.W.3d 227, 233–34 (Tex. App.—San Antonio 2011, no pet.)); *see In re R.D.Y.*, 51 S.W.3d 314, 321 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). "Absent such specific evidence, general evidence that a non-parent

13

would be a better custodian of the child is inadequate to rebut the parental presumption." *R.D.Y.*, 51 S.W.3d at 321. "When a parent and a nonparent are both seeking managing conservatorship, 'close calls' should be decided in favor of the parent." *R.H. v. D.A.*, No. 03-16-00442-CV, 2017 WL 875317, at *5 (Tex. App.—Austin Mar. 2, 2017, pet. dism'd) (mem. op.) (quoting *Lewelling*, 796 S.W.2d at 168).

The trial court may consider several factors in deciding when a nonparent has met their burden. Under Section 153.004 of the Texas Family Code,

> [i]n determining whether to appoint a party as a sole or joint managing conservator, the court shall consider evidence of the intentional use of abusive physical force . . . by a party directed against . . . a parent of the child . . . committed within a two-year period preceding the filing of the suit or during the pendency of the suit.

TEX. FAM. CODE ANN. § 153.004(a) (Supp.). Other "acts or omissions that constitute significant impairment include, but are not limit[ed] to, . . . severe neglect, abandonment, drug or alcohol abuse, or immoral behavior by a parent." *J.Y.*, 528 S.W.3d at 687. Other considerations include "a history of mental disorders, . . . bad judgment, . . . and an unstable, disorganized, chaotic lifestyle that has and will continue to put the child at risk." *Id.* (citing *In re S.T.*, 508 S.W.3d 482, 492 (Tex. App.—Fort Worth 2015, no pet.)).

"A fact[-]finder may infer the present fitness of the parent to be managing conservator from the parent's recent, deliberate past misconduct." *R.H.*, 2017 WL 875317, at *5. "However, evidence of past misconduct, standing alone, may not be sufficient to show present unfitness." *Id.* (citing *Chavez v. Chavez*, 148 S.W.3d 449, 458 (Tex. App.—El Paso 2004, no pet.); *In re M.W.*, 959 S.W.2d 661, 666 (Tex. App.—Tyler 1997, writ denied); *Taylor v. Taylor*, 254 S.W.3d 527, 536 (Tex. App.—Houston [1st Dist.] 2008, no pet.)).

14

**D.     Analysis**

First, we dispel Butler's argument that his appointment as a joint managing conservator was inconsistent with a finding that his appointment would significantly impair Claire's physical health or emotional development.  Section 153.131 prohibits the appointment of a nonparent as a child's managing conservator unless the trial court finds that the parents' appointment would significantly impair the child's physical health or emotional development.  TEX. FAM. CODE ANN. § 153.131(a).  Even so, the statutory language does not prohibit the parents' appointment even if such a finding is made.  *See id.*  "Where a trial court appoints a parent and nonparent as joint managing conservators, it implicitly rules that parent's sole custody would significantly impair the child's physical health or emotional development."  *In re L.D.F.*, 445 S.W.3d 823, 830 (Tex. App.—El Paso 2014, no pet.) (finding that father's appointment did not preclude grandmother's appointment as joint managing conservator) (citing *Mauldin v. Clements*, 428 S.W.3d 247, 264 (Tex. App.—Houston [1st Dist.] 2014, no pet.)).  Similarly, where both parents and a nonparent are appointed joint managing conservators, a trial court implicitly finds that appointment of only the parents would result in significant impairment to the child's physical health and emotional development.  *See id.*; *R.D.Y.*, 51 S.W.3d at 320–21 (naming father, mother, and grandmother joint managing conservators with the grandmother having the exclusive right to designate the child's primary residence).  Because the trial court permitted three-way joint custody, we must assume it impliedly found that Holly and Butler's appointment as the only joint managing conservators would significantly impair Claire's physical health or emotional development.

15

Our conclusion is bolstered by ample evidence presented at trial on several factors showing that appointment of only the biological parents would significantly impair Claire's emotional development. Holly testified that Butler had been physically abusive toward her twice, including when he punched her in the face during the pendency of the case. Holly admitted photos of the results of Butler's intentional use of physical force against her. "It is a rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child. A finding of a history of family violence involving the parents of a child removes the presumption." TEX. FAM. CODE ANN. § 153.131(b).

Butler admitted he knew that he could be Claire's father by the time she was born, but testified that he asked Holly for a DNA test several times in response to her requests to support the child financially. Because Butler testified that Jeremy should have known Claire was not his biological child by December 2014, the trial court could have concluded that Butler knew the child was his then and had willingly failed to support her.

Butler testified Holly was emotionally unstable, suicidal, and had issues with prescription drug abuse. He knew she had been arrested on several criminal charges, including one that occurred in Claire's presence, which were still pending at trial. The trial court's finding that Holly's appointment would significantly impair Claire's emotional development is unchallenged. Even though Holly was unfit, the trial court heard evidence that Butler planned on returning Claire to Holly after obtaining custody of the child. The trial court also heard that Butler and Holly were continuing their immoral, adulterous relationship and that it was Butler's plan to divorce Cindy and marry Holly so Claire could live with them. Butler had a history of PTSD, considered himself

16

cured, was no longer seeking treatment, and consumed alcohol to excess according to Holly and Waits. Given the plan to resume their tumultuous relationship, history of physical abuse between Butler and Holly, and Holly's unfitness, the trial court could have found Claire would be in danger of significant impairment to her emotional development if in the custody of only Butler and Holly.

There was also evidence that Butler exercised poor judgment by conspiring with Holly to violate court orders. The trial court's temporary orders only allowed Holly to have visitation supervised by Waits and did not provide for Butler's or Cindy's possession of Claire. Even so, Cindy testified that Holly allowed Butler and her to take the child to Gatesville during Holly's periods of possession. According to Cindy, Butler left Claire alone with her on several occasions during these times.

When she was in Gatesville, the evidence showed that Claire spent considerable time with Cindy and her other half-sisters and had even referred to Cindy's parents as "Granny and Papa." Butler and Cindy described how Claire had become attached to and was a part of their entire family. Although Butler and Cindy testified that they planned on moving Claire to Gatesville to live in their marital home, the trial court could have rejected Cindy's testimony that she did not expect to divorce Butler because she knew nothing of Butler and Holly's continued immoral sexual relationship. Instead, the trial court could have believed Holly's testimony that Butler's family life was unstable and concluded Claire's stability and emotional development would be harmed if she was moved to live in Gatesville in a home that was about to suffer the ravages of divorce.

From this evidence, the trial court could have concluded that Butler was not presently fit to be managing conservator with Holly absent Jeremy's joint appointment. The child had lived

17

most of her life with Jeremy and had only visited Butler a few times. An audio recording of a telephone call between Butler and Holly showed that Claire called Jeremy "daddy" and Butler "David." Most of the witnesses at trial testified that it was critical for Claire to remain with Amber and Heather because the sisters had grown up together and needed each other. These witnesses also established that Claire's life was in Morris County, not in Gatesville. "[S]ignificant impairment of emotional development may be inferred from uprooting a child," and the trial court could have concluded that separation from Jeremy and more time apart from Amber and Heather would uproot Claire from the life she had known since birth. *See In re De La Pena*, 999 S.W.2d 521, 529 (Tex. App.—El Paso 1999, no pet.) (citing *In re Rodriguez*, 940 S.W.2d 265, 273 (Tex. App.—San Antonio 1997, writ denied)).

We conclude that Jeremy presented more than a scintilla of evidence on the issue of whether appointment of Claire's biological parents alone would significantly impair her emotional development. Because the evidence of violence between Butler and Holly, alone, was sufficient to rebut the parental presumption, Jeremy rebutted the presumption by a preponderance of the evidence. After reviewing all the evidence, we cannot conclude that the trial court's decision was so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. As a result, we find the evidence legally and factually sufficient to support the finding that Jeremy successfully rebutted the parental presumption.

We also conclude that the trial court did not abuse its discretion in appointing Jeremy as the primary joint managing conservator. Although Section 153.131 sets forth "the standard for appointing a nonparent as managing conservator, the trial court's decisions are also governed by

18

Section 153.002, which mandates that '[t]he best interest of the child shall always be the primary consideration . . . in determining the issues of conservatorship and possession of and access to the child.'" *In re H.N.M.*, No. 06-08-00136-CV, 2009 WL 3365110, at *5 (Tex. App.—Texarkana Oct. 21, 2009, no pet.) (mem. op.) (quoting TEX. FAM. CODE ANN. § 153.002). Every party at trial, including Butler, testified that it was important for Claire to continue her relationship with Jeremy and her sisters. The evidence also showed that, even though he may have known Claire was not his biological child, Jeremy, not Butler, had provided for Claire all of her life. Claire referred to Jeremy, not Butler, as her father. We, therefore, find that sufficient evidence supports the trial court's finding that appointing Jeremy as the primary joint managing conservator was in Claire's best interests.

III. **Conclusion**

We affirm the trial court's judgment.


Scott E. Stevens
Justice

Date Submitted:     May 30, 2019
Date Decided:      May 31, 2019

19